[Crim. No. 22049. Aug. 27, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES EDWARD WHITT, Defendant and Appellant.

## COUNSEL

Brian J. O'Neill, under appointment by the Supreme Court, Myrna K. Greenberg, Shinaan S. Krakowsky and Manatt, Phelps, Rothenberg & Tunney for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer,

Assistant Attorney General, Jay M. Bloom and Steven V. Adler, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BIRD, C. J.**—This is an automatic appeal from a judgment imposing a penalty of death under the 1978 death penalty law. (Pen. Code, § 190.1 et seq.; see Pen. Code, § 1239, subd. (b).)[1]

Two guilt phase issues require review. The first is whether the trial court correctly denied appellant's motion to suppress the statements he made to a jailhouse informant. The second is whether the trial court erred in failing to fully instruct, *sua sponte,* on the risks involved in juror note-taking. The court concludes that neither issue merits reversal of the guilt verdicts. However, the special circumstance finding contains *Carlos (Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]) error, requiring a reversal of this finding.

I.

A. *Procedural History*

By information, appellant Charles Edward Whitt was charged with the murder of William McCafferty. A special circumstance was alleged in connection with this count in that the murder was committed while Whitt was engaged in the commission of a robbery in violation of section 211. (§ 190.2, subd. (a)(17)(i).)

Whitt was also charged with robbery, assault with a deadly weapon (§ 245, subd. (a)), and being an ex-felon in possession of a firearm (§ 12021).

Before trial, Whitt entered a guilty plea to the ex-felon charge. A jury convicted him of the remaining offenses and found the special circumstance allegation to be true. Following a penalty phase trial, the jury fixed the sentence at death. Thereafter, Whitt's motions for a new trial (§ 1181) and for modification of the verdict (§ 190.4, subd. (e)) were denied. This automatic appeal followed. (§ 1239, subd. (b).)

---

[1]All statutory references are to the Penal Code unless otherwise noted.

B. *The Guilt Phase Evidence*

On the evening of July 6, 1980, Whitt drove his pickup truck to Clella Goforth's house in Yucaipa. Ms. Goforth was acquainted with Whitt, but had not seen him in two years. Whitt told Ms. Goforth that he was looking for her business partner, Harold Williams. Whitt explained that he wanted to sell Williams some livestock because Whitt and his wife were separating, and he needed the money to move.

During this conversation, Ms. Goforth was standing inside a pool area enclosed by a masonry wall. Whitt was standing in the driveway outside the wall. They could see each other through the open grillwork along the top of the wall. Ms. Goforth did not notice any indication that Whitt had been drinking. She thought that he was under some stress due to the breakup of his marriage, but his conversation was coherent.

At the end of the conversation, Whitt said, "I'll be back to see Harold." He did not appear to be angry, and he returned to his truck. Suddenly, he turned and fired a shotgun at Ms. Goforth. The shotgun blast hit the wall within an inch of where Ms. Goforth had been standing. Whitt then drove off at a high speed.

Twenty minutes later, he arrived at the Elkhorn General Store in Forest Falls. He bought beer and cigarettes and talked with one of the other two customers in the store. The store clerk, Linda Weisz, did not notice any signs of intoxication. However, one customer thought Whitt appeared irritable, nervous, and possibly under the influence of cocaine or PCP. Whitt left the store before the other two customers.

A few minutes after the departure of these customers, Whitt came back into the store. He pointed a gun at Ms. Weisz and demanded money from the cash register. She handed him approximately $250. As he left, he walked "kind of sideways and backwards," watching Ms. Weisz while he backed out the front door. Almost immediately after Whitt was out the door, Ms. Weisz heard a gunshot. She locked the door and called the store owner. A minute later, she heard a screech of tires.

William McCafferty was found shortly thereafter lying on the ground in front of the store. He died en route to the hospital. The cause of his death was determined to be a shotgun wound to the neck. The sheriff's department was called, and Ms. Weisz gave a description of Whitt. Several neighbors gave a description of his truck, which had been parked in front of the store during the robbery. These descriptions were broadcast over police radio.

Whitt's truck was stopped, and he was arrested. A shotgun was found on the floor of the passenger compartment of his truck.[2] Nearly $250 in cash was taken from him during the booking procedures. A blood test administered at the sheriff's station revealed a blood alcohol level of .10 percent. Testimony indicated that assuming an average burnoff rate, Whitt's blood alcohol level could have been as high as .14 percent at the time of the offense.

At the sheriff's station, Whitt was placed in a cell with Jimmy deLoach. They shared the cell for several weeks. During this period, Whitt allegedly described the crimes to deLoach. At the trial, deLoach recounted that Whitt told him about going to see Harold Williams at Clella Goforth's house. When Ms. Goforth told Whitt that Williams was not home, Whitt said, "Well, when he gets back, tell him this." He then shot at Goforth and "didn't know how in the world he missed her."

DeLoach also testified that Whitt had related how he then went to the Elkhorn store to commit a robbery. As Whitt backed out of the store after taking the money, McCafferty called out, "Hey, what are you doing?" Whitt said he "turned around and blew him away." Whitt was afraid that McCafferty could identify him so, according to deLoach, he "had to get out of the area real fast." After travelling about 30 miles in a direction away from Yucaipa, Whitt turned around and came back because he wanted to kill Goforth. The police stopped him en route to her house. At first, Whitt wanted "to shoot it out with them," but he decided he "didn't have a chance."

DeLoach also testified that Whitt said that he was planning to present a defense that he had been drinking beer all day. Alternatively, he was thinking of testifying that McCafferty had grabbed his gun while he was walking out of the store and that the gun had gone off by accident.

The prosecution also presented the testimony of a prison psychiatrist, Dr. Flanagan. Dr. Flanagan was present when a detective interviewed Whitt on the evening following his arrest. He testified that Whitt was alert, observant, gave appropriate answers, and was able to take a "self-serving" position. He thought that Whitt showed no signs of mental illness, and he opined that the manner in which Whitt handled the interview indicated an ability to premeditate and to "choose a course of action."

---

[2] The shotgun was a single-shot weapon which had to be reloaded after each firing. It was loaded at the time of Whitt's arrest. When the gun is reloaded, an expended shell is ejected from the barrel. Expended shells were found near Clella Goforth's house and also within a quarter of a mile of the Elkhorn store.

Whitt presented a diminished capacity defense. He was 31 years old at the time of his trial and had a troubled medical and psychiatric history. He was hospitalized three times during his childhood for a congenital heart problem. In 1971, he was committed to a state mental hospital and remained on antipsychotic medication after his release.

For the three years preceding his arrest, Whitt lived with Sherry S. and her child. For most of that period, they lived in a house which they rented from Whitt's parents. Sherry testified that Whitt's personality began to change early in 1979. He became short-tempered and moody. He talked to himself a great deal. He would accuse Sherry of talking about him behind his back with the neighbors. He drank peppermint schnapps, which caused him to "go into an outrage," forget who he was, and call Sherry names. Other people had also seen him behave violently when he was drunk on peppermint schnapps.

In January 1980, Sherry told him that she would leave if he did not quit drinking and smoking marijuana. He stopped—at least until July—but during that six-month period he showed serious signs of mental disturbance. He was not working, and he frequently fought with his parents about the rent on the house. He would talk to the television, particularly during violent shows, saying things like "Shoot that so-and-so. . . . You don't got the heart to shoot him. Don't got the heart to blow him away."[3]

Whitt talked to himself as well. Sometimes he would go out in the yard and yell that people were talking behind his back, and they "didn't have the guts to face him like a man." Sherry also heard him talk this way in the middle of the night.

Whitt began drinking again on July 2nd, the Wednesday before his arrest. His parents visited that day and noticed him talking to the television set. He became very angry, shouted at them, and accused them of interfering with his life and creating problems between himself and Sherry. He ordered them out of the house. His mother handed Sherry an eviction notice, and the parents left.

By Saturday, July 5th, Sherry let Whitt know that she was planning to leave him. According to Sherry, Whitt was hurt, angry and acted very strangely. He stormed out of the house and did not come back that day. By noon on Sunday, the day of the robbery and shooting, he was drunk on

---

[3]This was Sherry's paraphrase of the language Whitt actually used. She said that he was "real violent" when he talked to the television.

peppermint schnapps. His speech was slurred and his walk impaired. He was still drunk when Sherry saw him on Sunday at 2 p.m.[4]

Two other people saw Whitt on Sunday afternoon. Eugene Burke bought some livestock and some tools from him and thought that he was drunk. Lela Downs saw Whitt when he asked her to tell Sherry to send his clothing to him. Ms. Downs thought Whitt was upset and extremely drunk.

In March 1981, psychologist Stephen Lawrence interviewed Whitt in the San Bernardino County jail. A videotape of that interview was played to the jury. In it, Whitt described how he goes "cuckoo bird" and becomes violent after drinking peppermint schnapps. He said that for the year and a half before his arrest, he was not working and stayed home most of the time. He fought with his parents every time they visited because his mother did not appreciate how much work he was doing on the house.

At the interview, Whitt rejected the suggestion that he was hearing imaginary voices. He admitted hearing voices, but said that he knew where they were coming from. He felt he had a "haunted ear"—"people living in my ear." At home, he could hear the neighbors talking about him at night just as though they were in his house. Their "incessant jabbering" would keep him awake. Then he would go out in the yard and yell at them. Whitt thought his television did not say the same things to him as it did to the neighbors across the street.

Whitt told Dr. Lawrence that a few days before his arrest, he knew that Sherry was leaving. She and her mother were selling things around the house and pocketing the money. He knew there were hard times ahead, but he gave up caring about everything. He thought that the situation had gotten so bad because people feared him and were afraid to tell him the truth. He was angry about being lied to. That weekend he got very drunk for the first time in over a year.

## C. *The Penalty Phase Evidence*

The prosecution established that Whitt had been convicted of robbery in 1974.

For the defense, Dr. Lawrence testified that Whitt had a variety of mental disorders—chronic paranoid schizophrenia dating back to adolescence, alcohol and drug dependence, and chronic and severe "antisocial personality

---

[4]In a prior interview with defense counsel, Sherry stated that by 2 p.m. Whitt was "absolutely bombed and crazy and screaming and hollering."

disorder." He had the mental capacity to form the intent to kill and to rob, but it was unlikely that he actually did form the intent to kill. He was probably acutely psychotic and hearing voices at the time of the robbery. According to Dr. Lawrence, Whitt was startled when McCafferty called out to him and thought that McCafferty had touched his gun. If McCafferty had appeared a few seconds later, Dr. Lawrence believed no shooting would have taken place.

Dr. Lawrence felt confident that Whitt had not tried to feign mental illness during his videotaped interview.[5] On the contrary, Whitt did not think of himself as mentally ill and during the interview denied that he had serious problems. As for Whitt's statements to deLoach, Dr. Lawrence explained that they were probably the boasting of someone who felt very inadequate.

Dr. Lawrence stated that the stress and the deteriorating situation preceding the crimes had seriously impaired Whitt's thinking. Whitt was aware that he was incapable of caring for himself, much less of supporting a family. His girlfriend and her child were in the process of leaving him, and his mother had served him with an eviction notice. He had no money and no place to go. Under these pressures, he became psychotic and delusional.

On cross-examination, the prosecutor focused on Whitt's "anti-social personality" rather than on his schizophrenia. Although Whitt comes from a middle-class family and has a brother who is a successful businessman, he has never been steadily employed. He began to abuse drugs in his teens and had many arrests for drug offenses. For several years, he was a "hanger-on" with a motorcycle gang.

Dr. Lawrence admitted that many of Whitt's ideas and actions were typical of an antisocial personality. For example, Whitt tended to justify his drug abuse and criminal activity. He thought that his own behavior was acceptable and that the police were harassing him. As another example, Whitt had become angry with his parents for not posting bail when he was on trial for the 1974 robbery, even though he had told them he would flee if he were released. According to Dr. Lawrence, Whitt's boasting to deLoach in the county jail was consistent with an antisocial personality.

Notwithstanding all these indications of an antisocial personality, Dr. Lawrence maintained that this disorder was no longer predominant during the few years preceding the offense. Whitt was no longer leading the intense, "high-pitched" and reckless life indicative of an antisocial person-

---

[5] The videotape of Dr. Lawrence's March 1981 interview with Whitt was replayed at the penalty phase.

ality, as he had done in his twenties. Instead he had withdrawn into an isolated existence with Sherry and was influenced primarily by his psychotic disorder. Dr. Lawrence felt certain that during the days leading up to the offense, this psychosis was affecting his behavior.

In rebuttal, the prosecution presented Dr. Flanagan, who testified that Whitt's prison records from the mid-1970's showed no manifestations of schizophrenia. Dr. Flanagan believed that schizophrenia would be aggravated by a stressful environment such as prison and that symptoms of this condition would have been observed by prison personnel.

The jury returned a sentence of death.

## II.

█ The trial court's failure to instruct the jury under *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131 will be addressed first because this error requires the special circumstance finding to be set aside and the penalty judgment to be reversed.

At the close of the guilt phase, the jury was instructed to find the robbery-murder special circumstance allegation true if it found "that the murder was committed during the immediate flight after the commission of a robbery by the defendant; and . . . that the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection." (See CALJIC No. 8.81.17 (4th ed., 1980 rev.).) The jury was not instructed to find that Whitt intended to kill or to aid a killing.

In *Carlos,* this court held that proof of intent to kill or to aid a killing is essential to sustain a felony-murder special circumstance allegation under the 1978 death penalty law. In *People* v. *Garcia* (1984) *ante,* pp. 539, 547-549 [205 Cal.Rptr. 265, 684 P.2d 826] this court has held that *Carlos* applies retroactively to all cases not yet final. *Garcia* also holds that where the instructions "completely eliminated the issue of intent to kill from the consideration of the jury," a reversal of the special circumstance finding is required. (*Id.,* at p. 554.)

*Garcia* recognizes four exceptions to this holding. Two are based on *Connecticut* v. *Johnson* (1983) 460 U.S. 73, 87 [74 L.Ed.2d 823, 834, 103 S.Ct. 969, 977-978] and would allow affirmance "if the erroneous instruction was given in connection with an offense for which the defendant was acquitted and if the instruction had no bearing on the offense for which he

was convicted" or "if the defendant conceded the issue of intent." (*People v. Garcia, supra, ante,* at p. 554.)

The third exception is based on *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], and provides that the failure to give a *Carlos* instruction is harmless error where " 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.' " (*People* v. *Garcia, supra, ante,* at p. 555, quoting from *People* v. *Sedeno, supra,* 10 Cal.3d at p. 721.)

The fourth exception is fashioned after *People* v. *Cantrell* (1973) 8 Cal.3d 672, 685 [105 Cal.Rptr. 792, 504 P.2d 1256] and *People* v. *Thornton* (1974) 11 Cal.3d 738, 768-769, footnote 20 [114 Cal.Rptr. 467, 523 P.2d 267]. Thus, "there may . . . be cases where the parties recognized that intent to kill was in issue, presented all evidence at their command on that issue, and in which the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration." (*People* v. *Garcia, supra, ante,* at p. 556, fn. omitted.)

None of these exceptions is applicable here. The *Connecticut* v. *Johnson* exceptions are inapplicable because appellant was not "acquitted" of the special circumstance allegation. Neither did he concede the issue of intent at this stage. The record indicates that he simply did not realize intent was in issue at that point.[6]

Nor does the *Cantrell-Thornton* exception apply. The parties *did* recognize that Whitt's intent to kill was in issue at the penalty phase. However, defense evidence on that issue—the testimony of Dr. Lawrence—cannot be dismissed as "not worthy of consideration." (*People* v. *Garcia, supra, ante,* at p. 556.)

Even the guilt phase evidence on this issue cannot be so dismissed. The shooting occurred within minutes after Whitt had told the store clerk that he didn't want to hurt anyone. It occurred within seconds after Whitt backed out the front door of the store. Apparently, McCafferty was standing on or near the store's front porch within a few feet of Whitt. Defense evidence suggested that the shooting was a reflexive action which occurred when McCafferty startled Whitt as he was leaving the store.

---

[6]At the penalty phase, defense counsel argued to the jury that it should fix the penalty at life without parole because Whitt had not killed intentionally. In the course of this argument, counsel stated that intent to kill had not been in issue at the guilt-special circumstance phase.

In addition, the evidence suggested that Whitt was intoxicated at the time of the shooting. Also, Whitt heard and responded to imaginary voices, and the shooting may have been a reaction to these voices. Thus, the existing record fails to establish an intent to kill as a matter of law.

Finally, the *Sedeno* exception (*People* v. *Sedeno, supra,* 10 Cal.3d 703) does not apply. No instruction squarely posed the question of an intent to kill. The murder count was submitted to the jury on a felony-murder theory. Thus, the jury was not required to find an intentional killing in order to return the first degree murder verdict.

It is true that the special circumstance instruction required the jury to find that Whitt shot McCafferty in order to carry out the robbery or to facilitate the escape. However, even this instruction did not necessarily require the jury to resolve that Whitt intended to kill. There was evidence that he intended to rob but lacked the intent to kill. Thus, the finding that Whitt killed in order to rob or to escape from the robbery may indicate only that the jury believed the shooting was a reaction to Whitt's sudden discovery that McCafferty was obstructing his path as he left the store.

Since there is no basis for concluding that the omission of the intent-to-kill element from the special circumstance instruction was harmless, that finding must be set aside. Accordingly, the judgment of death must also be reversed.

## III.

The first guilt phase issue involves Whitt's statements to Jimmy deLoach, his cellmate in the San Bernardino County jail, and whether these should have been suppressed under the Fifth or Sixth Amendments.

Prior to trial, Whitt moved unsuccessfully to suppress deLoach's testimony on the ground that deLoach was acting as a police agent when he talked with Whitt in the jail. Whitt argued that, as an agent, deLoach was required to give *Miranda*[7] warnings before taking any statement. On appeal, Whitt renews this claim. He also contends—despite the absence of objection below—that his statement was taken in violation of his Sixth Amendment right to counsel. Alternatively, Whitt contends that he was denied the effec-

---

[7]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

tive assistance of counsel by counsel's failure to preserve the Sixth Amendment claim.[8]

## A.

Whitt presented the factual basis for his claim at a lengthy pretrial hearing. DeLoach was arrested in Georgia in June 1980, having escaped from a California prison where he was serving a term for writing bad checks. Detective Stowe, who worked in the homicide division of the San Bernardino County Sheriff's office, went to Georgia to escort him back to San Bernardino County on an extradition warrant. During the flight back to California, the two had a friendly conversation but did not discuss deLoach's case. DeLoach appreciated the fact that Stowe allowed him to remove his leg restraints while they were on the plane. At the end of the flight, Stowe gave deLoach his card and asked deLoach to contact him if he heard anything about any homicides. Stowe testified that it was his standard practice to make this request of persons whom he arrested or transported.

DeLoach had previously worked as an informer for the federal Drug Enforcement Administration in Cleveland, Washington, and Philadelphia. He had also informed for the San Diego Police Department vice squad. He worked for money, rather than to "work off a beef." However, during the flight, deLoach did not discuss his career as an informer. When Stowe gave deLoach his card he was not aware that deLoach was a police informant.

DeLoach arrived at the jail on June 18th. Whitt was placed in his cell on July 7th. The jail sheriff testified that cell assignments were made by a floor deputy based on the availability of space. Neither the watch commander nor the floor deputy was aware of deLoach's prior career as an informer. The jail sheriff also testified that few newspapers were delivered to the jail before July 19th, so deLoach was probably not made aware of the importance of Whitt's case until several days after Whitt arrived.

Whitt and deLoach met on the morning of July 7th and recognized each other from San Quentin. Within hours, Whitt allegedly told deLoach his story. DeLoach promptly requested a meeting with Stowe. On July 8th he met with Stowe and with Detective Swanlund, an investigator on the Whitt case. DeLoach gave the two detectives a brief version of the offense as he

---

[8]Whitt claims a violation of his rights under the California Constitution as well as the federal Constitution. Article I, section 15 of the California Constitution contains guarantees analogous to those in the Fifth Amendment (privilege against self-incrimination) and Sixth Amendment (right to counsel) of the federal Constitution.

Hereafter, references to the Fifth and Sixth Amendments should be deemed references to the analogous provisions of article I, section 15 as well.

had learned it from Whitt. DeLoach also told them that Whitt was planning to present a defense that he was drunk at the time of the robbery.

At the conclusion of that conversation, Stowe said he would contact the district attorney's office about deLoach's case. Stowe also warned deLoach not to solicit any further information. Stowe was aware that if deLoach acted as a police agent, the information he gathered might not be admissible as evidence. However, deLoach was told that if he happened to hear any more information from Whitt, "there was nothing that we could do, you know."

Later in the afternoon of July 8th, deLoach talked to his attorney. DeLoach asked whether he could get a suspended or a concurrent sentence on the escape charge in exchange for cooperation on the Whitt case. The attorney warned him of the dangers of becoming a jail "snitch," and advised him that it probably was not worth his while to cooperate. The attorney advised him that at the very least, deLoach should obtain a promise of leniency in writing before giving the police any more information.

According to his attorney, deLoach understood that his instructions from the sheriff's detectives were to "keep Whitt talking." However, deLoach himself testified that Stowe had told him not to "mess with [Whitt]." The trial court found that the officers had told deLoach not to ask Whitt any further questions.

DeLoach did not see Stowe again after July 8th. On July 25th, Detective Swanlund came to see deLoach. This meeting was not at deLoach's request. Swanlund came because he wanted to make sure that deLoach was in protective custody before he released deLoach's July 8th statement to Whitt's attorney. At the meeting, deLoach volunteered that he had had further conversations with Whitt. DeLoach then gave Swanlund a much more detailed description of the crime as Whitt had allegedly told it to him.

At some point between July 8th and July 25th, the two detectives did contact the district attorney on deLoach's behalf. However, deLoach never received any promises of leniency, and testified that by July 25th he no longer expected any favors. Nor did he receive a more lenient sentence or other favorable treatment (other than protective custody) in exchange for his information.[9]

---

[9]DeLoach pled guilty to the escape charge on June 25th and hoped for a sentence concurrent with his underlying term. Apparently he was sentenced on July 29th, receiving a consecutive sentence.

On August 12th, deLoach wrote to the district attorney asking for a reduced sentence as consideration for the information he had provided. The letter was never answered. By the time he testified, his consecutive sentence had been served.

At the suppression hearing, deLoach testified that Whitt had volunteered all his statements about the offense and his possible defenses. DeLoach said that he had not asked any questions.

The trial court denied the motion to suppress Whitt's statements to deLoach. It found that these statements were made voluntarily, that the police had not asked deLoach to ask Whitt any questions, that deLoach did not receive or expect to receive any benefits, and that deLoach was not a police agent.

Whitt contends that these findings were erroneous, and that all statements made after July 8th—the date of deLoach's first meeting with the detectives—should have been suppressed. He argues that after that date, deLoach was acting as a police agent. Therefore, he argues, the state "deliberately elicited" his statements through deLoach, in violation of the Sixth Amendment right to counsel.[10] (*Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]; *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183].) He further argues that the statements were obtained in violation of the Fifth Amendment, since he was not *Mirandized* (*Miranda* v. *Arizona, supra,* 384 U.S. 436) and that his statements were not voluntary.

### B.

Preliminarily, Whitt argues that his Sixth Amendment claim may be raised on appeal even though he did not clearly articulate this objection in the trial court. (*People* v. *Quirk* (1982) 129 Cal.App.3d 618, 634 [181 Cal.Rptr. 301]; *Cahill* v. *Rushen* (E.D.Cal. 1980) 501 F.Supp. 1219, 1228, fn. 11, affd. (9th Cir. 1982) 678 F.2d 791.) Further, he contends that admission of an illegally obtained confession may be reviewed even in the absence of a contemporaneous objection, whether the illegality consists of a violation of Fifth or Sixth Amendment rights.[11] ■■■ Lastly, he asserts that his attorney's failure to articulate a Sixth Amendment objection denied him the effective assistance of counsel.

---

[10]Counsel was appointed for Whitt on July 9th. The Attorney General concedes that he was represented as of that date. Therefore, the government was not free to question him without the presence of his attorney after that date.

[11]Whitt has cited *People* v. *Underwood* (1964) 61 Cal.2d 113, 126 [37 Cal.Rptr. 313, 389 P.2d 937] to support this contention. *Underwood* involved a claim that a confession which had been coerced by physical abuse and by threats of the death penalty was erroneously admitted into evidence. This court reviewed the claim in the absence of a "sufficient and timely objection" below because "special policy considerations preclude the use of involuntary statements." (*Id.*, at p. 126.) As voluntariness is irrelevant to a Sixth Amendment claim (*Cahill* v. *Rushen, supra,* 501 F.Supp. at p. 1225), it is not clear that *Underwood* supports the argument that Whitt's Sixth Amendment claim may be addressed.

Notwithstanding defense counsel's failure expressly to state a Sixth Amendment claim, the parties developed an extensive record concerning the sheriff's department's relations with deLoach. ■■ Although the question is a close one, this record supports the conclusion that the state did not deliberately elicit Whitt's statements to deLoach. ■■ Therefore, defense counsel's failure to articulate a Sixth Amendment basis for his objection did not result in any prejudice to Whitt. (See *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].)

In *United States* v. *Henry, supra,* 447 U.S. 264, the United States Supreme Court explained what conduct on the part of the government and/or an informant would amount to deliberate elicitation. In *Henry,* the government agents contacted Nichols, a paid informant, who was housed in a cell with several federal prisoners, including the accused (Henry). Nichols was specifically told not to initiate any conversation with or question Henry about the charges against him. However, if Henry engaged Nichols in conversation or talked in front of him, Nichols was to "pay attention to" Henry's statements. (*United States* v. *Henry, supra,* 447 U.S. at p. 268 [65 L.Ed.2d at pp. 120-121].)

The court's holding that Henry's statements to Nichols were deliberately elicited was based on three factors. "First, Nichols was acting under instructions as a paid informant for the Government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols." (*United States* v. *Henry, supra,* 447 U.S. at p. 270 [65 L.Ed.2d at p. 122].)

The court did not focus on whether Nichols had actively interrogated Henry. Instead, the court noted only that "Nichols was not a passive listener; rather he had 'some conversations with Mr. Henry' while he was in jail and Henry's incriminatory statements were 'the product of this conversation.'" (*United States* v. *Henry, supra,* 447 U.S. at p. 271 [65 L.Ed.2d at pp. 122-123].)

While the court reserved the question whether there could be deliberate elicitation "where an informant is placed in close proximity but makes no effort to stimulate conversations about the crime charged" (*id.,* at p. 271, fn. 9 [65 L.Ed.2d at p. 123]), it recalled that "[i]n *Massiah,* [*Massiah* v. *United States, supra,* 377 U.S. 201] no inquiry was made as to whether Massiah or his codefendant first raised the subject of the crime under investigation." (*United States* v. *Henry, supra,* 447 U.S. at pp. 271-272 [65 L.Ed.2d at p. 123].) Nor did the court make such inquiry concerning the conversations between Henry and Nichols.

These passages indicate that in deciding whether information has been "deliberately elicited," the courts must focus on the state's conduct as a whole, rather than on the informant's. "By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." (*United States* v. *Henry, supra,* 447 U.S. at p. 274 [65 L.Ed.2d at p. 125].) Thus, *Henry* teaches that where the state has directed an informant to obtain incriminating information, or where it has created powerful inducements for him to do so—particularly in a custodial setting—it is not significant whether the informant or the accused initiated the conversation.

Cases decided in the wake of *Henry* confirm this conclusion. For example, in *United States* v. *Sampol* (D.C.Cir. 1980) 636 F.2d 621, an informant was placed on probation on condition that he spend six months in jail and provide the government with information about criminal activity. The informant faced a substantial prison sentence if he did not provide satisfactory information. (*Id.,* at pp. 632-635.) However, the government did not direct him toward any particular inmate. When the informant began bringing back reports from inmate Ross, the only instructions he received were not to initiate any conversations with Ross. (*Id.,* at p. 635.)

The *Sampol* court found that the informant obtained Ross' statements in violation of *Henry*. (*United States* v. *Sampol, supra,* 636 F.2d at pp. 637-638.) The court found it immaterial that the informant had not initiated any conversation with Ross. The informant was able to obtain the desired information without asking questions. He obtained it through his "ability to 'ingratiate' himself with criminals" and to encourage their confidences. (*Id.,* at p. 638.) This ability "was part of his stock in trade." (*Ibid.*) It was in fact the very quality which enabled him to bargain with the government for probation in exchange for jailhouse information. The government was well aware of this ability when it struck its bargain with the informant.[12]

In light of the government's knowledge of the informant's ability to elicit confidences, the *Sampol* court found it irrelevant that the government had not directed him towards Ross or towards any other particular inmate. By giving the informant a powerful inducement to bring back incriminating

---

[12]At the time of the plea bargain hearing, both the judge and the prosecutor knew that the informant had provided jailhouse information on several occasions. The informant told them that he was able to provide this information because he knew "a lot of people that are in crime and they are people that know me, and they are people that have always thought that 'this is one of our kind.' . . . [T]here are people that have confidence in me, they talk to me, and I could utilize these confidences if they would let me . . . ." (*United States* v. *Sampol, supra,* 636 F.2d at p. 633.)

statements from any inmate, the "government trolled in the jail, using [the informant] as bait, and was ready to net any unwary inmate who rose to the lure." (*United States* v. *Sampol, supra,* 636 F.2d at p. 638.) Thus, any statements the informant obtained after the date his bargain was struck with the government were "deliberately elicited" and were inadmissible under *Henry*.

In sum, the critical inquiry is whether the state has created a situation likely to provide it with incriminating statements from an accused. If it has, it may not disclaim responsibility for this information by the simple device of telling an informant to "listen but don't ask." Thus, the trial court's findings that deLoach was told not to question Whitt and that he did not do so are irrelevant to the question whether Whitt's statements were deliberately elicited.

It is also irrelevant to the *Henry* analysis that an accused's statements were voluntarily made. "Since 'coercion' is not a Sixth Amendment question, 'voluntariness' simply plays no part in the test of admissibility." (*Cahill* v. *Rushen, supra,* 501 F.Supp. at p. 1225.)

A factor which *is* significant in the analysis is the accused's custodial status. As *Henry* notes, "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents. . . . [T]he incriminating conversations between Henry and Nichols were facilitated by Nichols' conduct and apparent status as a person sharing a common plight." (*United States* v. *Henry, supra,* 447 U.S. at p. 274 [65 L.Ed.2d at p. 124]; see also *Cahill* v. *Rushen, supra,* 501 F.Supp. at p. 1228.)[13]

However, if an informant interrogates an accused, but acts on his own initiative rather than at the behest of the government, the government may not be said to have deliberately elicited the statements. (*Thomas* v. *Cox* (4th Cir. 1983) 708 F.2d 132, cert. den., 464 U.S. 918 [78 L.Ed.2d 262, 104 S.Ct. 284]; *United States* v. *Malik* (7th Cir. 1982) 680 F.2d 1162.) In *Thomas,* an informant told the state police investigator about some incriminating statements by a fellow inmate. The investigator advised the informant that no promises could be made but that information would be accepted if given.

---

[13]A California court has also recognized the importance of this factor. In *People* v. *Superior Court (Sosa)* (1983) 145 Cal.App.3d 581 [194 Cal.Rptr. 525], the informant did not ask for incriminating information, yet the accused's statements to him were ordered suppressed. The court reasoned that "both the police and [the informant] knew that a meeting with [the accused] would likely elicit incriminating evidence. [The accused was] in jail and under whatever psychological pressure would follow." (*Id.,* at p. 597.)

The informant returned with additional incriminating statements from the inmate. (*Thomas* v. *Cox, supra,* 708 F.2d at p. 133.) At an evidentiary hearing, the informant testified that his motive for collecting the information was "curiosity," and that he had not decided to cooperate with the state until after his release from prison. (*Id.,* at p. 134.)

The United States Court of Appeals held that this information had not been "deliberately elicited" under *Henry.* In *Henry,* the informant was "specifically contacted by the government and given his charge respecting the procurement of possibly incriminating information . . . ." (*Thomas* v. *Cox, supra,* 708 F.2d at p. 135.) Also, the informant in *Henry* was working on a contingent fee arrangement, for he was to be paid for information actually delivered. (*Ibid.*)

The *Thomas* court recognized that such a "fee" may be in the form of lenient sentencing rather than cash. (*Thomas* v. *Cox, supra,* 708 F.2d at pp. 135-136; see also *United States* v. *Sampol, supra,* 636 F.2d at pp. 632-638.) However, if the informant has been given no reason to anticipate lenient treatment and does not actually receive any reduction in sentencing, there is no "quid pro quo" arrangement to support a finding that the informant acted as a government agent. (*Thomas* v. *Cox, supra,* 708 F.2d at pp. 135-137, and fn. 4.)

Similarly, in *United States* v. *Malik* (7th Cir. 1982) 680 F.2d 1162, the informant (Richards) obtained damaging statements from two fellow inmates who were awaiting trial. Richards had previously been an informant for the Federal Bureau of Investigation (FBI) in other cases. However, at the time of his conversations with the Maliks, Richards was angry with the FBI agents, who had arrested him on an extradition warrant when he understood that they would not do so. (*Id.,* at p. 1164.) There was testimony that Richards was planning to make a deal with the Maliks at the time of his conversations with them, and only later decided to report those conversations to the government instead. (*Id.,* at p. 1165.)

As in *Thomas,* the court found that the government had not deliberately elicited the conversations with the Maliks. It "refuse[d] to extend the rule of *Massiah* and *Henry* to situations where an individual, acting on his own initiative, deliberately elicits incriminating information." (*United States* v. *Malik, supra,* 680 F.2d at p. 1165.) It observed that "[t]he Maliks suggest that the Government must go to extraordinary lengths to protect defendants from their own loose talk; they suggest that potential informants be segregated from other inmates. We do not believe that the Sixth Amendment right to counsel requires the Government to take such steps." (*Ibid.*)

 In light of the foregoing cases, this court concludes that Whitt's statements to deLoach were not deliberately elicited. The question is a very close and difficult one. The detectives' offer to speak to the prosecutor on deLoach's behalf on July 8th raises a serious concern as to whether the state gave deLoach an incentive to extract further statements from Whitt. Furthermore, the fact that the police must have realized on July 8th that deLoach was interested in informing and hoped for a reward for his information gives pause. If the police had had any working arrangements of this sort with deLoach in the past, their acceptance of his information and their agreement to speak to the prosecutor might well have been enough to attribute deLoach's post-July 8th activities to them.[14] Under those circumstances, the inference that deLoach expected a quid pro quo and that the police encouraged this expectation would be compelling.

However, absent such a prior relationship with deLoach, the mere acceptance of his information, even with the promise to talk to the prosecutor, is not sufficient encouragement to hold the police accountable for deLoach's subsequent actions. Furthermore, the promise to speak to the prosecutor was in no way conditioned on deLoach providing any further information. The police did not indicate that more information would help influence the prosecutor towards leniency. Finally, the police made no arrangements to contact deLoach again after July 8th regarding his conversations with Whitt. Detective Swanlund met with deLoach on July 25th only to notify him that Swanlund was going to release the July 8th report to the defense.

Most significant are the facts that the detectives did not succeed in obtaining any promise of leniency for deLoach, who must have been aware by July 25th that no promises were likely. Certainly, the police did nothing after July 8th to indicate to deLoach that his reports would in fact convince the prosecutor to be lenient.

Thus, on these close facts it cannot be found that the police gave deLoach the incentive to obtain information from Whitt after July 8th, to such an extent that deLoach's conduct is attributable to the state. As no Sixth Amendment claim can be established, defense counsel cannot be found ineffective for failing to raise it.

## C.

Whitt also contends that since deLoach was a police agent, deLoach was required to give *Miranda* warnings (*Miranda* v. *Arizona, supra,* 384 U.S. 436) before any interrogation.

---

[14]Apparently, the police were unaware of deLoach's prior career as an informant for other agencies until sometime after July 8th. However, the July 8th meeting in itself would notify the police that deLoach had some propensity to gather information and to seek to exchange it for leniency.

■ *Miranda* and its progeny govern law enforcement officials, their agents, and agents of the court. (*In re Deborah C.* (1981) 30 Cal.3d 125, 130 [177 Cal.Rptr. 852, 635 P.2d 446].) " 'A private citizen is not required to advise another individual of his rights before questioning him. Absent evidence of complicity on the part of law enforcement officials, the admissions or statements of a defendant to a private citizen infringe no constitutional guarantees.' [Citations.]" (*In re Eric J.* (1979) 25 Cal.3d 522, 527 [159 Cal.Rptr. 317, 601 P.2d 549].)

The trial court found that deLoach was not a police agent when he talked to Whitt. This finding was tantamount to a conclusion that there was no "law enforcement complicity" in deLoach's activities. For the reasons set forth in Part IIIB, *ante,* this court agrees that there was no agency relationship. Therefore, the trial court's conclusion was correct.

■ ■ ■ ■ Whitt nonetheless urges this court to reject the trial court's contrary finding as "palpably erroneous."[15] ■ An agency relationship between deLoach and the authorities was established, Whitt argues, because (1) deLoach obviously wanted leniency and had been advised by his attorney to obtain a written guarantee of leniency before providing any further information; and (2) the police wanted the information and, therefore, must have given deLoach some promise of leniency.

However, these motivations suggest at most a hope for some reward by deLoach. They do not demonstrate that the police actively encouraged this hope or that the police actually promised to do anything in exchange for information. Thus, the record does not demonstrate that an agency relationship was established.

In addition to his *Miranda* argument, Whitt contends that his statements should have been suppressed because they were involuntary. This claim, too, lacks merit. It is based solely on the premise that deLoach was acting as a government agent—a premise which is not tenable on the present record.

This court does not foreclose the possibility that when an accused is in custody and confides in a government agent who is "ostensibly no more than a fellow inmate" (*United States* v. *Henry, supra,* 447 U.S. at p. 270 [65 L.Ed.2d at p. 122]), his statements may be deemed involuntary even though there is no coercion. The accused may well make "voluntary" state-

---

[15] " '[T]he trial court's ruling on a *Miranda* issue may not be set aside by us unless it is *"palpably erroneous."* A ruling palpably erroneous is one lacking support of substantial evidence.' " (*In re Eric J., supra,* 25 Cal.3d at p. 527; quoting *People* v. *Duren* (1973) 9 Cal.3d 218, 238 [107 Cal.Rptr. 157, 507 P.2d 1365].)

ments when he believes he is conversing with an ally. Yet by purposefully creating a false sense of security, the state is in a sense causing or compelling the accused to speak when he would not otherwise do so. Here, however, the informant was *not* a government agent. There is no hint in the record of any other fact which rendered Whitt's statements involuntary.[16] Thus, they were properly admitted into evidence.

## IV.

■ ■ ■ ■ Whitt next contends that the guilt verdicts must be reversed due to the trial court's failure to give, *sua sponte,* a cautionary instruction on jury notetaking.[17]

■ Although section 1137 implicitly approves the practice of juror notetaking,[18] Whitt argues that the dangers inherent in this practice demand a cautionary instruction whenever the practice is allowed.

Several decisions from other jurisdictions have discussed this issue. In *People* v. *DiLuca* (1982) 85 App.Div.2d 439 [448 N.Y.S.2d 730], a New York court summarized the arguments against note-taking. There is a possibility that "more significance will be placed by the jurors on their notes, which may be inaccurate, incomplete or misleading, than on their own independent recollection. The notes may accentuate irrelevancies and ignore more substantial issues and evidence. . . . [T]he juror with the best notes will unduly influence and possibly mislead the other jurors." (*Id.,* at p. 734.) Furthermore, note-taking may "distract the jurors' attention from the proceedings. Instead of listening to important testimony, the jurors may be jotting down notes on a different and less important point. While taking notes, the jurors may also not pay sufficient attention to the behavior of witnesses and may thus be unable to properly assess their credibility." (*Ibid.*) A federal court has voiced similar concerns. (*United States* v. *Maclean* (3d Cir. 1978) 578 F.2d 64, 66.)

---

[16]Had deLoach in some way coerced these statements, they would of course be inadmissible regardless of deLoach's status as a private citizen. (*People* v. *Haydel* (1974) 12 Cal.3d 190 [115 Cal.Rptr. 394, 524 P.2d 866]; see also *In re Deborah C., supra,* 30 Cal.3d at p. 132.) There is no suggestion in the record that he did so.

[17]No request for such an instruction was made at trial. Nevertheless, the contention is properly raised on appeal. (§ 1259; *People* v. *Harris* (1981) 28 Cal.3d 935, 956 [171 Cal.Rptr. 679, 623 P.2d 240].)

[18]Section 1137 provides in relevant part: "Upon retiring for deliberation, the jury may take with them . . . notes of the testimony or other proceedings on the trial, taken by themselves or any of them, but none taken by any other person. . . ." A Court of Appeal has held that the use of note pads by the jurors "is endorsed by section 1137 of the Penal Code." (*People* v. *Cline* (1963) 222 Cal.App.2d 597, 601 [35 Cal.Rptr. 420].)

Because of these risks, a number of courts have held that a cautionary instruction is required. For example, the *DiLuca* court held that the instruction should include "an explanation . . . that [jurors] should not permit their note-taking to distract them from the ongoing proceedings; that their notes are only an aid to their memory and should not take precedence over their independent recollection; that those jurors who do not take notes should rely on their independent recollection of the evidence and not be influenced by the fact that another juror has taken notes; and that the notes are for the note taker's own personal use in refreshing his recollection of the evidence. The jury must be reminded that should any discrepancy exist between their recollection of the evidence and their notes, they should request that the record of the proceedings be read back and that it is the transcript that must prevail over their notes." (*People* v. *DiLuca, supra,* 448 N.Y.S.2d at p. 735.)[19]

The *DiLuca* court upheld the trial court's decision to permit note-taking, but found error in its failure to give this cautionary instruction. The error was found to require reversal because there was not "overwhelming evidence" in support of the verdict. (*Id.,* at p. 735.)

California, in contrast to New York and other jurisdictions, has given implicit statutory approval to note-taking. (§ 1137; see generally Annot. (1967) 14 A.L.R.3d 831.) However, it cannot be said that by enacting this statute the Legislature has determined that note-taking is free from the risks described in *DiLuca,* or that a cautionary instruction is not appropriate. For the reasons stated in *DiLuca* and *Maclean,* the better practice is to give such an instruction.

However, whether the trial court was required to so instruct in this case need not be decided since the trial court gave an instruction which included the cautionary warnings Whitt urges. The trial judge asked the jurors to "[b]e careful as to the amount of notes that you take. I'd rather that you observe the witness, observe the demeanor of that witness, listen to how that person testifies rather than taking copious notes. . . . [I]f you do not recall exactly as to what a witness might have said or you disagree, for instance, during the deliberation [*sic*] as to what a witness may have said,

---

[19]*United States* v. *Maclean, supra,* 578 F.2d 64, held a somewhat simpler instruction to be adequate. The judge in *Maclean* instructed the jurors that "notes are not entitled to any greater weight than the recollection or the impression of any other juror as to what the testimony may have been or what the conclusions should be arrived at . . . . It is hoped that you will fully understand that they are not official transcripts and may not cover points that are significant to another juror . . . ." (*Id.,* at p. 67.) Affirming, the United States Court of Appeals found that this instruction "fully informed the jurors of the proper use of notes and the pitfalls to be avoided." (*Ibid.*)

we can reread that transcript back by that witness back to you. Remember that aspect of it."

While this instruction was not as complete as the one outlined in *DiLuca,* it did inform the jury of the dangers which *Maclean* and *DiLuca* noted. Thus, the instruction substantially complied with the principles endorsed by these cases, even though a more complete instruction would have been preferable.

In any event, the evidence of guilt was relatively simple. The percipient witnesses to the assault and robbery gave straightforward accounts of the incidents. Even though Whitt presented evidence of diminished capacity, he never argued from this evidence that he was unable to form the specific intent to commit robbery,[20] and such evidence would not have negated his mens rea for the assault, a general intent crime. No other defense evidence suggested that he lacked the mens rea for either offense. Thus, the absence of a more extensive instruction on note-taking did not prejudice Whitt.

V.

■ ■■ ■ The judgment of guilt is affirmed. The special circumstance finding is ordered to be set aside, since the jury did not find that Whitt intended to kill or aid in a killing. As this was the sole special circumstance alleged, the ensuing judgment of death is reversed.[21]

---

[20]A finding that Whitt had the specific intent to commit robbery would, of course, have been sufficient to sustain the first degree murder verdict on felony-murder grounds.

[21]For the guidance of the trial court in the event of a retrial, it should be noted that one further assignment of error raised by Whitt concerning evidence admitted at the guilt phase appears to have merit. During its case in chief, the prosecution presented the testimony of Dr. Flanagan, a prison psychiatrist, to the effect that at the time of Whitt's postarrest interview during which he asserted his *Miranda* rights, Whitt was alert, "observant to his immediate surroundings," and "able to take a self-serving position." This testimony was offered to refute an anticipated diminished capacity defense. Defense counsel made no objection to it in the trial court.

Assuming this testimony should have been excluded upon a timely objection, it nonetheless appears to negate only the element of the intent to kill. None of Whitt's evidence negated an intent to rob, and defense counsel did not argue otherwise to the jury. An intent to rob was sufficient to sustain the first degree murder verdict. Thus, Dr. Flanagan's testimony could be prejudicial only with respect to the special circumstance finding. As this finding must be set aside for *Carlos* error (see *ante,* part II), it is not necessary to decide whether this court should resolve the admissibility of Dr. Flanagan's testimony in the absence of an objection below.

It does appear, however, that Dr. Flanagan's testimony was based solely on Whitt's words and conduct in invoking his *Miranda* rights. The testimony was, therefore, constitutionally objectionable. First, the prosecution was in effect permitted to use Whitt's exercise of his Fifth and Sixth Amendment rights to furnish evidence of the mental elements of the charged offenses. Yet *Miranda* itself teaches that "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 468, fn. 37 [16 L.Ed.2d at p. 720].) To make such use of an assertion of rights is impermissible because it would exact "a penalty . . . for exercising a constitutional privilege. It [would]

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**LUCAS, J.**—I concur with the majority opinion to the extent it affirms defendant's conviction of murder and other lesser offenses. I dissent, however, from the majority's reversal of the special circumstances finding and the judgment of death. In my view, the death penalty was properly imposed for defendant's commission of murder during a robbery. (See Pen. Code, § 190.2, subd. (a)(17)(i).)

The majority relies upon *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], for the proposition that the foregoing felony-murder special circumstance provision impliedly requires an *intent to kill.* Although I did not participate in *Carlos,* I am convinced by the analysis contained in Justice Richardson's dissent in that case (see *id.,* at pp. 156-160) that (1) neither the framers of nor the voters for the 1978 death penalty initiative contemplated the new law would require proof of an intent to kill in a felony-murder situation, and (2) imposition of the death penalty for felony murder is not prohibited by federal constitutional principles. No purpose would be served by reiterating Justice Richardson's analysis here.

Believing as I do that *Carlos* was incorrectly decided, a fortiori, I would not apply that case retroactively to all cases pending on appeal, nor would

---

cut[] down on the privilege by making its assertion costly." (*Griffin* v. *California* (1965) 380 U.S. 609, 614 [14 L.Ed.2d 106, 109-110, 85 S.Ct. 1229]; see also *Doyle* v. *Ohio* (1976) 426 U.S. 610, 618 [49 L.Ed.2d 91, 98, 96 S.Ct. 2240].) These principles apply whether the prosecution uses constitutionally protected silence to prove the actus reus or the mens rea of the charged offense. (*People* v. *Fabert* (1982) 127 Cal.App.3d 604, 610-611 [179 Cal.Rptr. 702]; *People* v. *Schindler* (1980) 114 Cal.App.3d 178, 186-187 [170 Cal.Rptr. 461].)

Even though evidence of Whitt's silence was not presented directly to the jury, but instead was used as the basis for an expert opinion on Whitt's guilt, the constitutional error is essentially the same as that identified in *Miranda* and *Griffin.* The prosecution may not make indirect use of constitutionally protected silence by presenting it to the jury in the form of an expert opinion. (*Gholson* v. *Estelle* (5th Cir. 1982) 675 F.2d 734, 742.)

A second reason why Dr. Flanagan's opinion was objectionable is that in effect it made use of a compelled communication to provide evidence of Whitt's guilty mens rea. Whitt was compelled to speak in order to assert his constitutionally protected right to silence. Furthermore, this speech—the statement that he wished to see an attorney rather than to discuss his case with the police—was a testimonial communication within the meaning of *People* v. *Rucker* (1980) 26 Cal.3d 368, 380-386 [162 Cal.Rptr. 13, 605 P.2d 843]. Its value to the prosecution depended on its content. (*Id.,* at p. 382, fn. 11.) "[T]he contents of appellant's disclosures were necessarily relevant to the purpose for which they were admitted. Only by examining whether his disclosures were responsive and accurate could anything be inferred about a lack of diminished capacity." (*Id.,* at p. 384.) Because the state relied on the contents of appellant's speech to prove its case, it used this speech as a testimonial communication. (*Ibid.*)

Thus, the state made use of the contents of a compelled testimonial communication in order to prove an element of the charged offense in violation of Whitt's privilege against self-incrimination. In the event of a retrial, Dr. Flanagan's testimony should not be admitted.

I impose the unrealistically rigid harmless error standards previously chosen by the majority. (See *People* v. *Garcia* [(1984) *ante,* pp. 539, 554-556 (205 Cal.Rptr. 265, 684 P.2d 826)].) In sum, finding myself in total disagreement with both *Carlos* and *Garcia,* I must dissent to the majority's reliance upon those cases in reversing the judgment of death.

In addition, I also disagree with the majority's ruling, for guidance of the trial court on retrial, regarding the admissibility of Dr. Flanagan's testimony. (*Ante,* pp. 748-749, fn. 21.) Dr. Flanagan had viewed defendant's postarrest interview during which defendant asserted his *Miranda* rights. Rather than reveal the content or substance of *any* of defendant's statements, or even the fact that he had refused to talk with the officers without an attorney present, Dr. Flanagan merely testified that defendant seemed alert and observant, lacking any symptoms of mental illness or intoxication, and capable of taking a "self-serving" position, and "choos[ing] a course of action."

The majority holds the foregoing testimony entirely inadmissible on two wholly indefensible grounds. First, the majority complains that such testimony enabled the prosecutor to "use" and therefore "penalize" defendant's constitutionally protected right to refuse to incriminate himself. The serious and conclusive flaw in the majority's analysis is that Dr. Flanagan never testified regarding defendant's assertion of his constitutional rights. Instead, the doctor's testimony related generally to defendant's appearance, mental condition and capacity to reflect. No mention whatever was made of defendant's assertion of his *Miranda* rights or his refusal to cooperate with the officers.

Nor does the majority's second reason for barring such testimony withstand close scrutiny. According to the majority, Dr. Flanagan's testimony "made use of a compelled communication to provide evidence of Whitt's guilty mens rea. Whitt was compelled to speak in order to assert his constitutionally protected right to silence." As indicated above, however, no such forbidden "use" occurred, for Dr. Flanagan made no reference to defendant's assertion of his constitutional rights, "compelled" or otherwise. The majority's reliance upon *People* v. *Rucker* (1980) 26 Cal.3d 368, 380-386 [162 Cal.Rptr. 13, 605 P.2d 843], is wholly misplaced. In *Rucker,* the defendant's own tape-recorded statements were read to the jury, supposedly for the limited purpose of indicating his mental state. Because the officers had violated the defendant's *Miranda* rights, however, his statements were held inadmissible even for that limited purpose. In the present case, by contrast, none of defendant's statements were admitted in evidence; moreover, no *Miranda* violation ever occurred. *Rucker* is totally inapposite.

I suggest that the majority's footnote ruling will have a devastating effect upon the prosecution's ability in future cases to rebut a defendant's reliance

upon so-called "mental" defenses. As I understand it, henceforth *all* testimony (presumably whether lay or expert) regarding the defendant's apparent mental condition or state of mind will be inadmissible if such testimony was based upon observing the accused in the course of a confrontation or interview culminating in his exercise of *Miranda* rights. Since such "interviews" *frequently* terminate in that manner, the People will be deprived of critical, highly relevant evidence demonstrating the accused's state of mind at a time usually quite contemporaneous with the commission of the crime. Such a far-reaching ruling should not be relegated to a mere footnote for "guidance" on retrial.

I would affirm the judgment in its entirety.