[Crim. No. 40539. Second Dist., Div. Five. June 25, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
LEONARD BROWN, Defendant and Appellant.

**COUNSEL**

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, and Monica Knox, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Gary R. Hahn and Donald E. deNicola, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FEINERMAN, P. J.**—This case has been remanded to us by the Supreme Court for reconsideration in light of *People* v. *Cantu* (1984) 161 Cal.App.3d 259 [207 Cal.Rptr. 460]; *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]; *People* v. *Garcia* (1984) 36 Cal.3d 539

[205 Cal.Rptr. 265, 684 P.2d 826] and *People* v. *Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669]. After a jury trial, defendant, Leonard Brown, was found guilty of two counts of murder (Pen. Code, § 187), two counts of rape (Pen. Code, § 261, subd. (2), two counts of forceable oral copulation (Pen. Code, § 288a, subds. (a), (c)), two counts of kidnaping (Pen. Code, § 207), and six counts of robbery (Pen. Code, § 211). The murders were found to have been committed under special circumstances within the meaning of Penal Code section 190.2, subdivision (a)(17). The jury further found that Brown used a firearm, a hand gun, in the commission of each of these offenses in violation of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1). Additionally, the jury found that Brown committed multiple murders. (Pen. Code, § 190.2, subd. (a)(3).) Brown admitted that he had served a term in a Wisconsin prison of over one year for rape, and that he had not been free of custody for five years at the time these present felonies were committed. (Pen. Code, § 667.5, subd. (b).) The jury found that Brown was sane at the time he committed each offense. It rejected the death penalty and determined that Brown should be sentenced to prison for life without the possibility of parole. He was so sentenced for each murder, the terms to run consecutively. He was also sentenced to a total consecutive term of 58 years, 8 months for the remaining counts and the enhancements.

Defendant alleges that he was denied a fair trial because: (1) the use of voter registration lists as the single source for his jury panel deprived him of a trial by a representative jury, (2) the "death qualification" of his jury deprived him of his right, at the guilt phase of his trial, to a representative jury, (3) the felony-murder rule may operate to impose liability for an unintended act and should be abolished in California; the jury should be instructed to find an intent to kill before it convicts a defendant of murder, (4) the felony-murder rule violates defendant's right to due process and equal protection, (5) principles of statutory construction require that Penal Code section 190.2, subdivision (a)(17), which mandates a sentence of death or life imprisonment without possibility of parole when a murder was committed in the commission, attempted commission or immediate flight after certain enumerated felonies, be interpreted to require an intentional killing in the course of a felony before the special circumstances may be found true, (6) a life sentence without possibility of parole, where there is no finding of an intentional killing, is cruel and unusual punishment, and (7) the fact that Penal Code section 190.2 precludes the possibility of parole, even if mitigating factors exist, renders the statute unconstitutional on its face. We find, under *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, and *People* v. *Garcia, supra,* 36 Cal.3d 539, that the findings of special circumstances must be set aside as to count II (victim Henkens), but that the find-

ings of special circumstances as to count XI (victim Turner) and the judgment of conviction should otherwise be affirmed.

In addition, defendant states that he was sentenced in error to full consecutive terms for the two rape counts and two oral copulation counts under Penal Code section 667.6. This section did not become effective until *after* the date that defendant committed these offenses. Therefore, Brown's sentence for these offenses should have been computed under Penal Code section 1170.1. The People concede that defendant's sentence should be recomputed and we agree. We remand this case to the trial court for recomputation of defendant's sentence on the two rape and two oral copulation counts pursuant to Penal Code section 1170.1, as well as for further proceedings with respect to the special circumstances allegations.

## FACTS

The 14 counts of which defendant stands convicted relate to a crime spree that took place over a four-day period. On December 4, 1979, at approximately 9:30 p.m., Brown forced his way into the apartment of Richard Ladd in Venice, California. He took money, a set of keys, a watch, and three guns from Ladd. He fled when Ladd was able to slam a door, grab a gun, and threatened to kill him.

Brown proceeded to the nearby home of Robert Henkens. When Henkens' wife arrived later that evening, she found her husband dead from a gunshot wound to the head. Cash and a black leather jacket were missing from the Henkens' home. Richard Ladd's keys were found there. Henkens' tenant, Jonathan Stein, had heard a gunshot through their common wall at approximately 10:10 that evening. Shortly thereafter, a voice which he thought at that time was Henkens' said, "Sorry about the noise." At trial, Brown testified that an accomplice in the robbery, Ed Witherspoon, shot Henkens in a bedroom, while Brown was in Henkens' kitchen helping himself to some ice cream. He introduced no evidence to corroborate his testimony.

Brown next forced his way into the apartment of Vito Korosa in Venice. He was armed with two guns. Over a period of approximately seven hours he took money from Korosa and ransacked the apartment. He took some of Korosa's clothing and left some of his own in Korosa's apartment. He also left the black leather jacket which he had taken from the home of Robert Henkens. At approximately 5:30 a.m. on December 5, he forced Korosa to drive him to Compton where Korosa let him out of the car.

On December 6, at approximately 10:30 a.m., Brown walked into the living room of Bruce Butcher in Long Beach, armed with a gun. He took

money and clothing from Butcher and then asked Butcher where he could find a woman. After he learned that Susan G. was at home in the apartment upstairs, Brown forced Butcher to accompany him there. Brown pointed a gun at Susan, hit her on the forehead with the gun, and forced her to have sexual intercourse with him in the presence of Butcher. He then forced Susan to orally copulate Butcher. After searching Susan's apartment and taking a small amount of money from her purse, he ordered Butcher to drive him to Compton and let him out at a bus stop.

On December 7, 1979, about 9 p.m., Rosemary S. met Brown at the home of her friend Sintoria Watson. Rosemary agreed to drive Brown to a home in Compton. While they were driving, Brown brandished a gun. Rosemary feared that she would be raped on the street. She suggested that they go to her home, and Brown agreed. When they entered the home, Brown had the gun in a paper bag. Rosemary lived with Harry Turner. Turner was at home when they arrived. Turner offered to drive Brown wherever he wanted to go and turned around to go into the bedroom to put on a shirt. Brown shot him in the back. Turner and Rosemary grappled with Brown, and Brown shot Turner again. Turner fell, and Brown shot him a third time. Rosemary begged Brown to be allowed to call for help for Turner. Instead, Brown grabbed Turner by the top of the head and said, "I killed you for her. This is my bitch now." Brown raped Rosemary on the floor, next to Turner's body. He then forced her to orally copulate him. He continued to rape her throughout the night.

According to Rosemary's testimony, Brown's behavior after shooting Turner was erratic. He appeared to go through a number of mood changes or personality changes. "He would get mad, and then he would start, you know, raising his voice a little. And then he would simmer down and look like he was almost ready to cry, because he had realized what he had done." Brown approached Turner's body and, as though just recognizing what he had done said, "Oh, my God, I've shot this man." He then resumed his abusive behavior toward Rosemary. Later he started to cry and said, "Why did I kill him. Why did I kill him?" He apologized to Rosemary for what he had done and also apologized to Turner saying, "I'm sorry, man. I didn't mean to kill you." He alternated, also, between telling Rosemary she would be his woman and she would marry him and bear his children, and calling her a bitch and forcing her to perform sex acts. At some point after shooting Turner, Brown took Turner's money and went through his I.D.

On direct examination Rosemary testified that she believed that Brown was under the influence of alcohol because he vomited while he was in her car before they went to her house. Also while in the car he offered her some marijuana, which she declined. She denied smelling an odor of PCP. He

did not smoke anything in her presence. Rosemary further testified that Brown appeared to have sobered up by the time they got to her house and did not appear to be under the influence of PCP or drugs.

On cross-examination Rosemary was impeached with her preliminary hearing testimony that the envelope of smoking material Brown offered her smelled like PCP. She also admitted telling police officers that he was on something and explained that "he looked like he had something the way he kept going off and on." After reflecting on the subject, she believed at the time of trial that he must have been under the influence of some drug.

Sometime around 4 a.m., Brown forced Rosemary to drive him away from the home. They were spotted and followed by the police. Rosemary jumped from the car. Moments later, the car crashed into a nearby home and Brown was captured.

Brown testified that he had smoked Sherman cigarettes dipped in PCP throughout the four-day period during which the crimes were committed. He testified that he, Watson and Rosemary shared a double-dipped PCP cigarette[1] in the car before Watson was dropped off and he and Rosemary proceeded to Rosemary's house. As a result of smoking that cigarette, Brown kept "fading out." He would have his eyes open, "but everything would go blank." He explained: "You can be sitting there and everything will go black. But when you came back around, you still be in the same position." He had difficulty walking and Rosemary had to help him into the house.

He described the shooting of Turner as follows: he was seated on a couch when he saw Turner standing and staring at him. Brown stood up and fell over something. He reached in the bag containing the gun. Turner was hollering at Rosemary. Turner came toward Brown and grabbed him. Then Rosemary also grabbed him. The gun went off. Turner stumbled backwards and Brown shot again. Turner squatted down and dropped his head. Brown thought he was supposed to take care of Rosemary and told her he would do so and would marry her. The only thing he could remember about his arrest was that someone pointed a shotgun at him and he dove to the ground. The next thing he remembers was waking up in the hospital strapped to a bed at the hands, arms and ankles, with tubes coming out of his arm.

### THE USE OF VOTER REGISTRATION LISTS AS THE SOLE SOURCE OF JURY PANELS

At the time of defendant's trial, jury members in Los Angeles County were drawn solely from lists of registered voters. Brown contends that this

---

[1]This had reference to a marijuana cigarette dipped twice in PCP, double the strength of an ordinary PCP cigarette.

procedure results in nonrepresentative juries because the use of voter registration lists leads to a significant underrepresentation of blacks and hispanics. The Supreme Court accepted this argument in *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433], but declined to rule on the retroactivity of its decision. In *People* v. *Cantu, supra,* 161 Cal.App.3d 259, cited by the Supreme Court in its order remanding the present case to us, the Court of Appeal concluded, in a well-reasoned opinion with which we wholly concur, that *People* v. *Harris, supra,* 36 Cal.3d 36, should not be applied retroactively. Use of voter registration lists to select the jury which tried defendant therefore does not invalidate his conviction.

### "THE DEATH QUALIFICATION" OF DEFENDANT'S JURY

█ Ten prospective jurors at defendant's trial were excused for cause by the prosecutor when they answered they could never vote to impose the death penalty. Four of these jurors stated that they could, however, vote for verdicts of first degree murder and findings of special circumstances. Such jurors have been denominated as the "automatic life imprisonment" group. Juries in a capital case from which such jurors have been excluded for cause have been referred to as "death-qualified" juries. (See *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 16, fn. 34 [168 Cal.Rptr. 128, 616 P.2d 1301].) Brown asserts that the exclusion of these jurors at the guilt phase of his trial deprived him of his right to have a jury representative of a fair cross-section of the community determine his guilt or innocence. He asserts that these jurors constitute a cognizable group—that is, a group whose members share a common perspective arising from their life experience in the group and whose perspective cannot adequately be represented by any other members of the community. (*Rubio* v. *Superior Court* (1979) 24 Cal.3d 93 [154 Cal.Rptr. 734, 593 P.2d 595].)

Defendant's challenge must fail for two reasons. First, defendant raised no challenge to the exclusion of these jurors at the time of trial. He cannot raise this point for the first time on appeal. (*People* v. *Haskett* (1982) 30 Cal.3d 841, 860 [180 Cal.Rptr. 640, 640 P.2d 776].) Second, Brown's challenge is based upon studies which the California Supreme Court has already found to be inadequate to demonstrate that he was deprived of a representative jury.

Defendant bases his challenge upon several of the studies presented in *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1. These studies suggest that opponents of capital punishment differ from other prospective jurors in their attitudes toward various aspects of the criminal justice system. The *Hovey* court discussed this data at length and concluded that in order to establish

that a capital case jury in California is drawn from a pool that is less than neutral with respect to guilt, in other words not drawn "from a pool which reasonably mirrors the diversity of experiences and relevant viewpoints of those persons in the community who can fairly and impartially try the case," defendant must establish deficiencies in a pool of jurors identical to those qualified to serve in capital cases in California—that is, jurors who either favored the death penalty, were indifferent, or opposed the death penalty. (*Id.*, at pp. 21-22, fn. omitted.) All of the studies which *Hovey* presented included a fourth group, the "automatic death penalty" group—jurors who would automatically vote to impose the death penalty following a conviction for a capital offense and who are excluded from service on capital case juries in California. In the instant case, as in *Hovey,* defendant could not prevail without the introduction of additional data based upon studies of only those jurors qualified to serve on capital cases in California. This he did not attempt to do.

### THE PROPRIETY OF THE FELONY-MURDER RULE

Brown states that California's felony-murder rule is based upon common law, not statute, and therefore this court can and should abolish the doctrine. We need not address the origin of the doctrine, for we are bound by prior decisions of this state's highest court when that court has spoken on an issue. ■ "Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court." (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

The felony-murder rule has repeatedly been affirmed by the Supreme Court, against attacks on both policy and constitutional grounds, most notably in *People* v. *Turner, supra,* 37 Cal.3d 302, 327, cited in the order remanding the present case to us, and in *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], upon which *Turner* relied.

■ By his own admission, Brown participated in an armed robbery in which one of the robbers shot the victim, Robert Henkens. There was sufficient evidence to permit the jury to conclude that Brown shot Turner as part of a scheme to rape Turner's girlfriend, Rosemary S., or for purposes of robbing Turner. Thus, we are bound by prior California Supreme Court decisions to affirm his convictions for felony murder.

### PENAL CODE SECTION 190.2, SUBDIVISION (a)(17)

With respect to victim Henkens (count II), the jury found defendant guilty of first degree murder and found true the special circumstances that the

murder was committed in the course of robbery (Pen. Code, § 190.2, subd. (a)(17)(i)) and in the course of burglary (Pen. Code, § 190.2, subd. (a)(17)(vii)). With respect to victim Turner (count XI), the jury also found defendant guilty of first degree murder and found true the special circumstances that the murder was committed in the course of burglary (Pen. Code, § 190.2, subd. (a)(17)(vii)) and in the course of rape (Pen. Code, § 190.2, subd. (a)(17)(iii)).[2]

In *Carlos* v. *Superior Court, supra,* 35 Cal.3d at page 153, the Supreme Court interpreted Penal Code section 190.2, subdivision (a)(17), to require that before a defendant can be subjected to a sentence of death or life imprisonment without possibility of parole for a murder committed in the course of designated felonies, the prosecution must prove that the defendant intended to kill the victim.

The *Carlos* rule was first developed in connection with liability of an accomplice who was not the actual killer. The defendant Carlos and another man, Perez, had robbed a store. Upon leaving the store they were confronted outside by an off-duty policeman. Carlos fled the scene. While Carlos was away from the scene, Perez engaged in a shootout with the officer and a bystander was killed, possibly by the officer's gun. (35 Cal.3d at p. 137.) Under the felony-murder doctrine the perpetrator of a felony and his accomplice are liable for a killing committed in the course of a felony even where the killing was unintended or accidental. Noting this doctrine is "often criticized as imposing punishment disproportionate to culpability" (*id.,* at p. 136), the Supreme Court was unwilling to extend it to impose not only responsibility for first degree murder but also liability for the maximum punishment of death or life imprisonment without possibility of parole. (*Id.,* at p. 146.) The court therefore construed Penal Code section 190.2, subdivision (a)(17), to require an intentional killing. Although relying in part on voter ballot pamphlet arguments and construction of ambiguous statutes in favor of the defendant, the court was also strongly influenced by a United States Supreme Court holding that to impose the death penalty on an accomplice who neither intends to kill nor contemplates the use of lethal force would constitute cruel and unusual punishment under the federal Constitution. (*Id.,* at pp. 148-150, citing *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368].)

The instant case was tried before the *Carlos* decision. After defendant had testified, his counsel requested that the trial court instruct the jury that an

---

[2]As to Turner, the jury found not true the allegation that the murder was committed in the course of robbery, apparently because defendant did not remove Turner's wallet from his body until well after the shooting.

intentional killing was required in order to sustain a finding of special circumstances, but the trial court refused this request.

In *People* v. *Garcia, supra,* 36 Cal.3d at page 549, also involving an accomplice rather than the actual killer, the Supreme Court held the *Carlos* rule retroactive to all cases not yet final. Since a number of cases tried before the *Carlos* decision would contain instructional errors,[3] the Supreme Court gave guidance in *Garcia,* at pages 549-557, for determining whether such instructional error requires reversal. The court held that the failure to instruct the jury on the necessary element of intent to kill requires reversal in all but four limited circumstances in which such error could be deemed harmless: (1) if the erroneous instruction was given in connection with an offense for which the defendant was acquitted and has no bearing on the offense for which he was convicted; (2) if the defendant conceded the issue of intent; (3) if the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions; and (4) if the parties recognized that intent to kill was an issue, presented all evidence at their command on that issue, the record establishes the necessary intent as a matter of law and the contrary evidence is not worthy of consideration. (*People* v. *Garcia, supra,* 36 Cal.3d at pp. 554-557.) In other words, the failure to submit the issue of intent to the jury could be harmless only where (1) it was irrelevant; (2) it was conceded; (3) it was necessarily resolved against the defendant in light of other instructions; or (4) there was no issue for the jury to decide because intent was shown as a matter of law and the defendant had no evidence worthy of any consideration that the killing was not intentional.

The purpose of *Carlos* and *Garcia* is to prevent the imposition of the death penalty or a sentence of life without possibility of parole in a case where a killing committed in the course of the designated felonies might have been accidental or unintentional and that issue was not fully tried and determined adversely to the defendant.

In a series of decisions since *Carlos* and *Garcia,* the Supreme Court has considered whether the third and fourth *Garcia* exceptions could be applied to uphold a special circumstance finding. In these cases the court found reversible error because either (1) the defendant had presented no evidence on the issue of intent due to the trial court's erroneous pre-*Carlos* ruling that such intent was not required or (2) under the instructions given, the jury could have found the special circumstances allegation true *even if* the jury had believed the most favorable defense evidence suggesting lacking of intent to kill.

---

[3] Since the *Carlos* case arose on a pretrial writ, no instructional error was involved.

In *People* v. *Garcia, supra,* 36 Cal.3d 539, the defendant waited in a getaway car while the perpetrator committed an armed robbery, killing a clerk. (*Id.,* at p. 545.) The Supreme Court reversed the special circumstances finding. "The jury did not find that he intended to kill in connection with some other, proper instruction. And the evidence does not come close to establishing an intent to kill as a matter of law. [¶] Defendant did not shoot the victim and was not present in the store at the time of the shooting. The fact that he agreed to aid a robbery, knowing his companion was armed, is insufficient to demonstrate that defendant himself intended to aid a killing." (*Id.,* 36 Cal.3d at p. 557.)

In *People* v. *Turner, supra,* 37 Cal.3d 302, 328, the prosecution was based on circumstantial evidence that the killings were perpetrated in the course of a burglary committed by the two codefendants. The prosecutor told the jury that it did not matter which of the codefendants shot the victims, and thus the finding of special circumstances could have been based on a felony-murder accomplice theory. The defendant Turner presented no defense but the codefendant Sousa testified that although Turner did the shooting, Turner had later told him that he was startled by the armed homeowner, had a PCP blackout, and "accidentally" shot the victims. Even had the jury believed that testimony favorable to Turner, it could have found true the special circumstances under erroneous pre-*Carlos* instructions. In that context, the Supreme Court concluded "[n]either the verdict on guilt nor the other special circumstance implies a finding on intent." (*Id.,* at p. 328.)

In a number of subsequent cases the Supreme Court has reversed for *Carlos* error even as to the actual perpetrator. (*People* v. *Whitt* (1984) 36 Cal.3d 724 [205 Cal.Rptr. 810, 685 P.2d 1161]; *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430]; *People* v. *Armendariz* (1984) 37 Cal.3d 573 [209 Cal.Rptr. 664, 693 P.2d 243]; *People* v. *Anderson* (1985) 38 Cal.3d 58 [210 Cal.Rptr. 777, 694 P.2d 1149]; *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782]; *People* v. *Hayes* (1985) 38 Cal.3d 780 [214 Cal.Rptr. 652, 699 P.2d 1259]. See also *Carlos* v. *Superior Court, supra,* 35 Cal.3d at pp. 136, fn. 4, 150.) In each of these cases, either the defendant did not present a defense involving lack of intention to kill or, in the context of evidence and instructions given, no inference reasonably could be drawn from the verdict that the jury had necessarily resolved that issue against him.

In *People* v. *Whitt, supra,* 36 Cal.3d 724, the defendant Whitt, having robbed a store clerk, was backing out the door of the store when he shot and killed a bystander, McCafferty. There was defense evidence which suggested that the shooting was a reflexive action which occurred when the

victim startled defendant. The Supreme Court considered the third *Garcia* exception but held on the facts of that case that it did not apply. Although the jury had found the special circumstance that defendant shot the victim in order to carry out the robbery or facilitate his escape, this did not necessarily require the jury to resolve whether he intended to kill. "Thus, the finding that Whitt killed in order to rob or to escape from the robbery may indicate only that the jury believed the shooting was a reaction to Whitt's sudden discovery that McCafferty was obstructing his path as he left the store." (*Id.*, 36 Cal.3d at p. 736.)

In *People* v. *Ramos, supra,* 37 Cal.3d 136, defendant and his accomplice robbed a restaurant and defendant shot two of the victims, killing one and grazing the other. The defendant presented *no defense* at the guilt phase because the trial court erroneously ruled, prior to the *Carlos* decision, that lack of intent to kill would not be relevant. Evidence at the penalty phase indicated, however, that the defendant would have testified he did not intend to kill the victims but only intended to knock them out and graze them so that his accomplice, who wanted defendant to kill them, would think that had been accomplished. The Supreme Court held it could not apply the third *Garcia* exception in those circumstances, because the defendant's decision not to offer evidence of lack of intent was induced by the very trial court error of which defendant complained. No adverse finding could be implied from the jury's verdict under those circumstances. (*Id.*, at pp. 147-148, fn. 2.)

In *People* v. *Armendariz, supra,* 37 Cal.3d 573, the defendant was tried on a felony-murder theory and the jury found the special circumstances that the killing was committed in the course of a robbery and of a burglary. Defendant presented a defense that he had *not perpetrated the killing* but had entered the house and found the victim already dead. He admitted taking the victim's property. (*Id.*, at pp. 577, 584-585.) Thus, *Armendariz* was also a case in which the defendant did not present evidence on the specific issue of intent to kill. "Any possible evidence negating an intent to kill would have been irrelevant and may have been withheld from the trier of fact." (*Id.*, at p. 578.) "No other instruction required the jury to resolve the issue of intent for the case was submitted on a felony-murder theory. Thus, it cannot be said that 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.' " (*Ibid.*)

In *People* v. *Anderson, supra,* 38 Cal.3d 58, the defendant burglarized a home he believed was empty but suddenly encountered the elderly resident, shooting and killing her. Although he did not present a defense at trial, his confession to the police indicated he shot reflexively when he unexpectedly

found a figure looming toward him in the dark. (*Id.,* at p. 60.) Discussing only the fourth *Garcia* exception, and rejecting it, the Supreme Court noted that the parties had not put intent into issue at trial. (*Id.,* at pp. 61-62.) In those circumstances, intent was not shown as a matter of law nor could it be inferred necessarily from the jury verdict.

In *People* v. *Hayes, supra,* 38 Cal.3d 780, during two robberies the defendant shot and killed the robbery victims when they made sudden moves. The defendant presented *no defense* because at the close of the prosecution case the trial court announced its intention to instruct that intent to kill was not required.

Finally, in *People* v. *Boyd, supra,* 38 Cal.3d 762, the defendant attempted to rob a passing pedestrian. When the victim replied he had no money, defendant shot him in the chest. Although defendant did not testify at trial, defense counsel attempted to establish through other witnesses that the defendant took PCP on the day of the crime, that PCP users may engage in bizarre and violent behavior, and that the killing was an unpremeditated act induced by PCP. The jury's verdict that defendant committed first degree murder while defendant was engaged in the attempted commission of robbery "did not necessarily establish that defendant intended to kill. Under the instructions given, defendant would have been guilty of first degree murder with felony-murder special circumstances if he intended to rob Edsill and the killing occurred during the commission of the attempted robbery, *even if* the killing itself was an unintentional, impulsive, drug-induced act." (*Id.,* at p. 771, italics added.)

Considering the circumstances of this case in light of all these decisions, we conclude that the special circumstances as to victim Henkens must be set aside but the special circumstances as to victim Turner should be affirmed on the basis of the third *Garcia* exception.

The third *Garcia* exception is based on *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], which held that "in some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury." (*Ibid.; People* v.

*Garcia, supra,* 36 Cal.3d at pp. 554-555; see also *People* v. *Alcala* (1984) 36 Cal.3d 604, 627, fn. 13 [205 Cal.Rptr. 775, 685 P.2d 1126].)[4]

■ In this case, defendant testified on his own behalf, and his trial counsel cross-examined Rosemary S., with the obvious purpose of attempting to show that defendant did not intentionally kill Turner. According to his own testimony, defendant did not pull a gun on Rosemary in the car. Rather, she sold him a PCP cigarette for $20, he smoked too much of it, became sick and started blanking out. He was sick in the back seat of the car when Rosemary shook him and tried to get him to go upstairs to her house. He told her he was not going anywhere and he lay back down, but the next thing he remembered Rosemary had his head out of the car and he was vomiting. She then helped him upstairs. He had not threatened to rape her and did not even ask to go to her house. He did, however, carry with him a paper bag containing a gun. After entering the home, he saw Turner standing behind him; defendant got up, fell over something and took out the bag. Turner started coming at him, so defendant reached in the bag, Turner grabbed him, Rosemary also grabbed him, and the gun went off. Turner started stumbling backwards and defendant shot him again. Turner looked up at defendant, then dropped his head. After Turner dropped his head, defendant thought he was supposed to take care of Rosemary and marry her. He told Rosemary to take down her pants, forced her into the bedroom, and attempted to have intercourse but failed. Defendant's cross-examination of Rosemary had also attempted to bolster the theory of a possible PCP blackout. After defendant had testified, his counsel requested the trial court to give an instruction requiring an intentional killing for special circumstances, which the court refused.

Rosemary, on the other hand, had testified for the prosecution that defendant threatened her with a gun in her car and that, knowing Turner would be there, she persuaded defendant to go to her home, telling defendant, "You don't have to rape me out on the street, you know." After they entered her home Turner was cooperative with defendant, offered to drive defendant somewhere and turned toward the bedroom to put on a shirt, but defendant then pulled the gun out of the paper bag and fired it at Turner's back. Turner was alive on the floor, but defendant then shot him in the chest. Defendant told Rosemary to take her clothes off. She begged defendant to let her aid Turner, but defendant then grabbed Turner by the top of

---

[4]In *People* v. *Alcala, supra,* the murder was committed in the course of kidnaping. Since kidnaping is listed in Penal Code section 190.2, subdivision (a)(17)(ii), but not among the designated felonies in the statutory felony-murder rule (Pen. Code, § 189), the jury must have relied on the evidence of premeditation and deliberation in finding first degree murder. Citing *Sedeno,* the Supreme Court held that in those circumstances "we do not face the problem addressed in *Carlos . . . ."* (*Id.,* at p. 627, fn. 13.)

his head and said, "I killed you for her. This is my bitch now." Defendant then raped Rosemary right next to Turner's dying body and raped her repeatedly throughout the night.

In each of the Supreme Court cases since *Carlos,* the special circumstances finding could not be upheld because the defendant presented no defense regarding intent, or under the evidence and the instructions given, the jury could have found true the special circumstances even if the jury had believed the defense evidence suggesting lack of intent to kill. That is not the case here. Defendant was the perpetrator, not an accomplice. He admitted his involvement in the killing but claimed it was unintentional. Defendant presented a full defense based on lack of intent to kill. It was not until after defendant had presented this defense that the trial court refused his request for a *Carlos*-type instruction. The court instructed the jury to find whether the killing was perpetrated "while the defendant [was engaged in] in the [commission] [or] [attempted commission] of" robbery, rape or burglary. The jury found that the killing was perpetrated while defendant was engaged in the commission or attempted commission of rape and burglary, but not robbery. The jury could not have returned this verdict had it believed the defense evidence or the evidence suggestive of a PCP blackout. According to defendant, he had entered the apartment innocently, shot Turner accidentally, or during a PCP blackout, after Turner made a move toward him, and unsuccessfully attempted to rape Rosemary as an afterthought because he was supposed to take care of her and marry her after Turner's death. In order to find that the killing was perpetrated while defendant was engaged in the commission or attempted commission of rape and burglary, the jury had to reject defendant's evidence and accept Rosemary's testimony that defendant entered the apartment in order to commit rape and that he purposely killed Turner in order to rape her, just as he stated when he told Turner "I killed you for her. This is my bitch now," followed by his raping of Rosemary next to Turner's body despite Rosemary's pleas to aid Turner while he was still alive. The jury found not true the special circumstance that the murder was perpetrated in the commission of robbery. The taking of Turner's wallet occurred considerably later, apparently as an afterthought. Had the jury believed defendant's story that the rape was likewise an afterthought, the jury would not have found true that the killing was perpetrated while defendant was engaged in the commission of burglary and rape.

Under the evidence and instructions given, there was no way the jury could have found the special circumstances true while at the same time believing the evidence that the killing was unintentional. There was no version of the evidence which would have supported such a distinction. To reach its verdict, the jury had to accept the evidence which showed that

defendant intentionally killed the victim, and in this unique evidentiary and instructional context, " '. . . the factual question posed by the omitted [*Carlos*] instruction was necessarily resolved adversely to the defendant under other, properly given instructions. . . .'" (*People* v. *Garcia, supra,* 36 Cal.3d at p. 555; *People* v. *Sedeno, supra,* 10 Cal.3d at p. 721; *People* v. *Miller* (1974) 43 Cal.App.3d 77, 84 [117 Cal.Rptr. 491].) The purposes of *Carlos* and *Garcia* are satisfied because, unlike any of the other cases considered by the Supreme Court, the record shows that defendant presented his defense of nonintentional killing and the jury necessarily found the killing was intentional in arriving at its verdicts. Thus, in the case at bench, the special circumstances finding as to victim Turner (count XI) can be affirmed.

■ As to victim Henkens (count II), however, the *Carlos* error was prejudicial. Defendant testified that he entered the Henkens apartment with an accomplice in order to commit robbery but that the accomplice shot Henkens in another room while defendant was in the kitchen eating ice cream. The jury could have found true the special circumstances that the killing was committed in the course of burglary and robbery without necessarily finding that defendant intended Henkens to be killed. Accordingly, the special circumstances findings as to Henkens must be reversed.

The jury also found true the special circumstance that defendant was in this proceeding convicted of more than one first degree murder. (Pen. Code, § 190.2, subd. (a)(3).) However, this special circumstance is also subject to the *Carlos* rule, and cannot stand in light of the reversal as to victim Henkens. (*People* v. *Turner, supra,* 37 Cal.3d 302, 328-329.)

### EX POST FACTO APPLICATION OF PENAL CODE SECTION 667.6

Brown's crimes were committed in 1979. Under Penal Code section 667.6, he was sentenced to serve full, separate, and consecutive sentences for the forcible sex offenses which he committed. Penal Code section 667.6 became effective in 1980. Therefore, he must be sentenced pursuant to Penal Code section 1170.1, the statute in effect at the time of the commission of the crimes. ■ When a sentencing error is discovered while defendant's appeal is pending, the appellate court should remand the case for proper sentencing. (*People* v. *Benton* (1979) 100 Cal.App.3d 92, 102 [161 Cal.Rptr. 12].)

### DISPOSITION

The findings of special circumstances pursuant to Penal Code section 190.2, subdivision (a)(3) (multiple murders), as to counts II and XI, are

reversed. The findings of special circumstances as to count II, pursuant to Penal Code section 190.2, subdivision (a)(17) (robbery and burglary), are reversed. The cause is remanded for further proceedings and for resentencing on counts VIII, XI, XIII, and XIV (rape and oral copulation) pursuant to Penal Code section 1170.1. In all other respects, including the findings of special circumstances as to count XI, pursuant to Penal Code section 190.2, subdivision (a)(17) (rape and burglary), the judgment is affirmed.

Ashby, J., and Eagleson, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 25, 1985.