Filed 12/10/24  P. v. Duran CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>               v.<br><br>ALBERTO VELO DURAN,<br><br>        Defendant and Appellant. | F086881<br><br>(Super. Ct. No. CR-20-007470)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Shawn D. Bessey, Judge.

Martin Baker for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench, and Jessica A. Eros, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Alberto Velo Duran was convicted of multiple counts of sexual abuse of his daughters that lasted for several years.  The trial court sentenced him to 85 years to life.  On appeal, Duran contends a pretext call with his daughters was involuntary and inadmissible due to coercion and promises of leniency.  We reject this contention.  Duran

further argues his confession during his interview with law enforcement was poisonous "fruit" traceable back to the pretext call and improperly admitted. We also reject this argument and affirm.

## PROCEDURAL BACKGROUND

On April 3, 2023, the Stanislaus County District Attorney filed an amended information charging Duran with continuous sexual abuse of a child under 14, Jane Doe 1[1] (Pen. Code, § 288.5, subd. (a); count 1);[2] continuous sexual abuse of a child under 14, Jane Doe 2 (§ 288.5, subd. (a); count 2); oral copulation or sexual penetration of a child 10 or under, Jane Doe 1 (§ 288.7, subd. (b); count 3); sodomy of Jane Doe 1 (§ 286, subd. (c)(1); count 4); sexual acts with a child 10 or under, Jane Doe 2 (§ 288.7, subd. (a); count 5); and oral copulation or sexual penetration of a child 10 or under, Jane Doe 2 (§ 288.7, subd. (b); count 6). As to counts 1 and 2, the information further alleged a multiple victim enhancement (§ 667.61, subds. (b), (e)(4)).

On March 30, 2023, Duran filed a motion to exclude a pretext phone call he had with Jane Does 1 and 2 regarding the sexual abuse. After a hearing held on April 5, 2023, the trial court denied Duran's motion.

On April 12, 2023, a jury convicted Duran as charged. The jury further found the enhancements true as to counts 1 and 2.

On September 11, 2023, the trial court sentenced Duran to 85 years to life as follows: four consecutive terms of 15 years to life on counts 1 through 3 and count 6, plus a consecutive 25 years to life on count 5, plus an aggregate six years (the middle term) on count 4 to run concurrently to the other terms.

---

[1] The amended information refers to the victims as Confidential Victim #1 and Confidential Victim #2; we will refer to them as Jane Doe 1 and Jane Doe 2.

[2] All further undesignated statutory references are to the Penal Code unless otherwise stated.

# FACTUAL BACKGROUND

## A. Sexual Assaults to Jane Doe 1

Jane Doe 1 was born on December 27, 1999. Jane Doe 1 is the older sister of Jane Doe 2; Duran is their father. He first sexually assaulted Jane Doe 1 when she was six years old. At that time, Jane Doe 1 went into her parents' room at night because she was afraid. She got into bed with her mother and father and laid next to her father. Jane Doe 1's back was towards Duran; there was no one on the other side of her. He began touching her arms, then his hands traveled down her body and rubbed her vagina and breasts. His hand did not go inside Jane Doe 1's vagina at that time. While doing this, Duran told Jane Doe 1, "It [is] okay, I [will] protect you." She told him to "get off."

While Jane Doe 1 was between the ages of six and 10 years old, Duran sexually abused her once every six months. During these times, he would touch her vagina and breasts, and sometimes he would put his fingers inside her vagina. When Jane Doe 1 was 11 years old, Duran began touching her breasts and vagina about once every month or two months.

When Jane Doe 1 was 12 years old, she was home sick from school and Duran stayed home with her; they were the only ones home. Duran offered to "massage" Jane Doe 1 because he told her it would make her "feel better." He began massaging her in her parents' bedroom on the bed. She laid on her stomach and Duran was on top of her. After a few seconds of massaging, Duran then wrapped his arms around under her body and started touching her vagina, breasts, and "butt." Then, he took off Doe 1's pants, pulled down his own pants, and touched her "butt" with his penis. When Duran put his penis inside her "butt," she started crying because it hurt. He stopped after she said it hurt, and he said, "I [am] sorry."

While Jane Doe 1 was between the ages of 12 and 20, Duran inserted his penis into her vagina about once or twice a year. Every time he sexually abused her, he told her not to tell anyone. She was afraid to tell anyone. She did not think her mother would

3.

believe her.  When she was about 14 years old, she mentioned the sexual abuse to Jane Doe 2.  Years later, Jane Doe 1 eventually told her boyfriend about the sexual abuse, and then the police.

### B. Sexual Assaults to Jane Doe 2

Jane Doe 2 was born on May 5, 2001.  The first sexual encounter with Duran happened when she was eight years old.  She was asleep in her bedroom and awoke to Duran behind her in the bed.  He asked her if she was scared and she told him "no."  But he said, "I [am] going to hug you anyway."  He laid down behind her and began to hug her under the covers.  He brought her closer to him so that her "butt" was touching his penis.  He put his hands in the front of her pajamas and rubbed her vagina.  She tried to push him away but he continued to rub her vagina for about two minutes.

Another time, when Jane Doe 2 was still eight years old, she and Duran were alone on the couch in the living room.  He put his penis in her vagina for about five minutes.

When she was about ten or eleven years old, she got out of school early one day because she got mud on her pants and took a shower.  Duran entered her room after she got out of the shower and was still in a towel.  He asked her if she needed any help.  Then, he took off her towel and pressed Jane Doe 2 against her bed.  He pulled his pants down and inserted his penis into her "butt."  He pressed his hands against her back and put her face into a pillow.  She was unable to breathe.

While Jane Doe 2 was between the ages of 11 and 13, Duran sexually abused her at least once a year.  The last time Duran sexually abused her was when she was 13 years old.  He got on top of her and inserted his penis into her vagina.  She did not tell anyone about the sexual assaults because she did not think anyone would believe her and she was embarrassed her father would do those things to her.  She was about 19 years old when she reported the sexual abuse to the police.

4.

## C. The Pretext Call

Jane Does 1 and 2 agreed to place a pretext call to Duran. Detectives Brandon Bertram and Paul Inderbitzen were present at the police department with Jane Does 1 and 2 during the call.

The pretext call began with Jane Doe 1 asking Duran whether he had sexually abused their youngest sister. Duran denied abusing her. He also denied having sex or inappropriately touching Jane Does 1 and 2. He told them he did not want to discuss this over the phone and asked if they were alone or if the call was being recorded. Jane Doe 1 said, "[I]f you tell me the truth … I [will not] say anything, but if you do [not], I [am] [going to] go to the cops." Duran replied, "Okay?"

Duran continued to ask where Jane Doe 1 was located. She said that she was in the car with Jane Doe 2 alone. Jane Doe 1 asked, "But did you do it to us?" Duran said, "Well .…"

Jane Doe 1 asked, "[D]id you put your penis in mine[?]" Duran admitted he had put his penis in both of their "butts" and engaged in sexual intercourse with Jane Does 1 and 2 multiple times. Jane Doe 1 asked Duran why he put his penis in their "butts" when they were six and eight years old. He said, "Because I [am] an ass, I [am] a dumb person." He admitted that he had sex with them when they "let" him. He said he touched Jane Does 1 and 2 "everywhere" and again confirmed he had sex with Jane Doe 1 "a lot of times."

Jane Doe 2 said that she was still in elementary school when Duran had sex with her and put his penis in her "butt." After some back and forth Duran said, "you know it, I [am] sorry. I [am] a bad person." He denied that he had sex with them while they were asleep. He said, "You would ask me to massage you and I would just massage you. And then it just kept going." He told them that he was sorry for having sex with them.

Jane Doe 2 asked Duran if he was going to tell their mother. He said, "Whatever you guys want to do." He also said, "If you guys [want to] report me, it [is] fine." Jane

5.

Doe 1 asked, "[I]f we tell the cops, are you [going to] tell the cops that you did it?" Duran replied, "[I]f you guys are going to, yeah, I have to. I have to go to jail."

### D. Bertram's Interview with Duran

Later that day, Bertram met Duran in front of his house and informed him he needed to speak with him at the police department. Duran said he had a small idea of what Bertram wanted to talk about.

A recording of the interview begins with Duran providing identifying information. He was read his *Miranda*[3] rights; he said he understood them and wanted to talk to law enforcement. Duran told Bertram the girls would "lay down" next to him and he would comfort and massage them. He initially only massaged their backs but then it started to get "out [of] hand …." Duran admitted to touching them "inappropriately." During the massages, he typically sat on top of the girls and straddled them like a saddle on a horse. He said that he touched Jane Does 1 and 2's "butts", breasts, vaginas, and "private parts."

Duran started having sexual intercourse with Jane Doe 1 when she was about eight or nine years old, about once or twice a month, until she was about 17 years old.[4] He denied putting his penis in Jane Doe 1's "butt." He said he would begin by rubbing Jane Doe 1's back. Then, he moved to her "butt", breasts, and vagina. Once Jane Doe 1 started moving a little bit, he became aroused and would have sexual intercourse with her. The intercourse would last about five minutes each time because he would realize it was wrong and stop. However, after a few weeks, he would do it again.

Duran told Bertram that when Jane Doe 1 was around 12 years old, she stayed home from school because she was sick. His wife was at work, and no one else was home. He wanted to comfort her because she was sick, so he began to massage her

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

[4] Later, Duran admitted having sexual intercourse with Jane Doe 1 until she was 19 years old.

stomach. She moved and Duran said he "started to … feel good." Duran said he "maybe" tried to put his penis in her "butt" but Jane Doe 1 told him it was hurting her, so he stopped.

Duran said he began touching Jane Doe 2 when she was around eight or nine years old. He kissed her on the neck and tried to kiss her on the lips. He said he inserted his penis into her vagina about 10 or 15 times. He claimed he did not remember putting his penis inside Jane Doe 2's "butt." He stopped having sex with her when she was 13 years old because she made him nervous by wanting to tell her mother.

Duran claimed Jane Doe 1 wanted to have sex with him when she had been about 13 years old. He said she moved "her buttocks against [his] penis to get [him] aroused." However, he then said he did not believe she would have been aroused by him. Duran knew his daughters had not been old enough to give consent for him to have sex with them. Bertram said, you "raped" your two children "[t]heir whole lives." Duran responded, "Yeah. There [is] not a way to describe it."

## E. Duran's Testimony

Duran denied all allegations against him at trial. He testified about the pretext call with Jane Does 1 and 2. He was unaware that the call was being recorded. He said he changed his answers to their questions during the pretext call after Jane Doe 1 said she would call the police if he did not tell the truth.

Duran also testified about the interview with Bertram. He claimed he admitted the sexual assaults because he was scared. During his interview, Bertram never threatened Duran or made any promises of leniency. Duran continued to talk to Bertram even after Bertram told him he was going to jail. He also testified he chose to talk to Bertram after being read his *Miranda* rights and felt comfortable denying certain allegations he did not believe were true.

## DISCUSSION

### I.        The Court did not Err in Admitting the Pretext Call

Duran contends the court erred in failing to exclude the pretext call with Jane Does 1 and 2. He further claims that since the pretext call should have been excluded, his interview with Bertram is the unlawful "fruit" of the poisonous tree, and the admission of both prejudiced his case. The People maintain Jane Does 1 and 2 were not acting as agents of law enforcement and therefore it is irrelevant that they engaged in tactics that may have been interpreted by Duran as coercive. The People further contend that Duran waived his argument by conceding his interview with Bertram was admissible, and, even reaching the merits, the interview was voluntary, and Duran suffered no prejudice. We agree with the People.

#### A.  Additional Background

##### a.  The Pretext Call

Bertram and Inderbitzen spoke with Jane Does 1 and 2 about doing a pretext call before it occurred. Bertram discussed tactics, such as trying to elicit a response from Duran by telling him they were concerned for the safety of their youngest sister. Inderbitzen told Jane Does 1 and 2 to make sure Duran knew they were alone so he would feel comfortable talking to them about the allegations.

Bertram wrote notes to Jane Does 1 and 2 during the call. Inderbitzen told the girls that if they "stall out" or get "nervous" to tell Duran that they will "call [him] right back" and hang up the phone so that another "game plan" could be reached. Bertram and Inderbitzen did not provide Jane Does 1 and 2 with a script. Bertram told them it was important to act "normal" on the phone. To that end, Bertram said, "[Y]ou [are] [going to] cry … [if you] [c]ry. You [are] [going to] cuss if you cuss … [b]e normal. Okay?"

### b. Defense Counsel and the Prosecutor's Arguments

Before trial, Duran sought to exclude the pretext call with Jane Does 1 and 2. The prosecution countered and moved to admit the evidence as an admissible statement of a party opponent.

Defense counsel argued Duran's statements in the pretext call were coerced. The defense claimed that Jane Doe 1 threatened Duran when she told him, " '[I]f you tell me the truth, I will [not] say anything. If you do [not], I [am] going to go to the cops.' " Also, Jane Doe 1 promised leniency when she told Duran, " 'It was wrong, but we forgive you.' " Defense counsel further argued Jane Does 1 and 2 acted as agents of the state during the pretext call because (1) they were at the police station; (2) Bertram suggested the call to get Duran to admit the allegations, he told them what to say, and directed the conversation with handwritten notes; and (3) the call was recorded.

The prosecution noted Duran was not under arrest or detained during the pretext call and had no expectation of privacy. The prosecutor further argued that it would be unreasonable to believe Jane Does 1 and 2 had the authority to offer leniency.

### c. The Trial Court's Ruling

The trial court denied Duran's motion to exclude the pretext call. The court reasoned:

> "[W]hat we have here are two daughters talking to a father on a phone. [Duran] is not in custody. He [is] nowhere on the premises. He is not in handcuffs. He does [not] have police surrounding him. He has the ability to hang up or not say anything and those are all circumstances that would lean toward [a finding] that it [is] not coercion.

> "And … [there is] not … a police officer talking to [Duran] and making any claims of leniency in an official capacity, so that would not be official coercion there.

> "And then … [there is] not … any law enforcement threats .…

> "[I]t was … Jane Doe [1] saying that if you do [not] tell us, we [are] going to go to the cops … [I]s that designed to elicit a response[?] The

9.

answer is absolutely yes.  But during this whole process … Jane Doe [1] and … Jane Doe [2] are sometimes following directives and sometimes ad libbing, so it [is] like a free-flowing conversation.

"So you can[not] really say … all questions and every statement is attributed to law enforcement, [and] you have to be law enforcement that is doing the threats, and … doing the promise for leniency.  But that could be done … [in] circumstances where … [it] is done through a police agent, but in this case I do [not] think what … Jane Doe [1] specifically is saying is attributed to … law enforcement.  It does [not] appear to me that everything said was directly related to police questioning.  It was just the flow of the conversation.

"These [girls] are not trained personnel.  They are not trained in interrogation.  [The questions were] clearly … untrained persons asking questions.  And there [is] a lot of that in that conversation .…

"[Duran] is not in custody.  He [is] free to leave.  He [is] free to terminate that call.  He is not in a situation where he is surrounded by law enforcement, detained in any way.  And in no sense are the threats, I [am] going to go to the police, especially when you take the whole conversation … [Duran says] I do [not] care if you go to the police … it [is] … a flow of conversation that is not perfect in any sense of the imagination related to interrogation, but it [is] two young individuals talking to their dad, trying to elicit a response no doubt.  And they did.

"[I]t was give and take throughout the conversation.  And I do [not] find as a totality of the circumstances that was coercive in the sense that [Duran] was not responding of his own free will .…

"And in that sense it [is] reliable … [given] the totality of the circumstances, the request to keep this out or suppress that statement in any way is denied."

Further, the court ruled that Duran's interview with law enforcement was admissible as an admission of a party opponent.  Defense counsel conceded the interview was admissible.  The court also noted Duran decided to discuss the allegations with Bertram after he was given *Miranda* warnings.

## B. Law

The due process clause of the Fourteenth Amendment prohibits the admission of an involuntary confession by coercion.  (*People v. Neal* (2003) 31 Cal.4th 63, 79.)  "To

determine the voluntariness of a confession, courts examine ' "whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." [Citation.] In making this determination, courts apply a 'totality of the circumstances' test, looking at the nature of the interrogation and the circumstances relating to the particular defendant." (*People v. Dykes* (2009) 46 Cal.4th 731, 752 (*Dykes*).) The due process clause is a restriction on the state. (U.S. Const., 14th Amend. ["No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law .…"].) Thus, "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the [d]ue [p]rocess [c]lause .…" absent state coercion. (*Colorado v. Connelly* (1986) 479 U.S. 157, 166 (*Connelly*); accord *People v. Whitt* (1984) 36 Cal.3d 724, 745 (*Whitt*) [" '[a]bsent evidence of complicity on the part of law enforcement officials, the admissions or statements of a defendant to a private citizen infringe no constitutional guarantees' "].)

We independently review the trial court's legal conclusion as to the voluntariness of Duran's statement during the pretext call. (*Dykes, supra,* 46 Cal.4th at p. 751.) The court's factual findings, credibility determinations, and circumstances surrounding the confession are upheld if supported by substantial evidence. (*Ibid*.)

## C. Analysis

### a. Admission of the Pretext Call

The trial court determined Jane Does 1 and 2 were not acting as agents of law enforcement. The court further found not everything Jane Does 1 and 2 said was attributable to law enforcement but improvised from a "free-flowing conversation." The court also found the things that Jane Does 1 and 2 did say were not coercive given the totality of the circumstances.

The court's factual findings were supported by substantial evidence. The record before us does not show that Bertram or Inderbitzen told Jane Does 1 and 2 to threaten Duran. Similarly, there is no evidence that the detectives told Jane Does 1 and 2 to offer leniency to Duran in exchange for information. There is no evidence of a script.[5] In fact, before the call Bertram encouraged Jane Does 1 and 2 to act "normal" and do what they would normally do in a situation in which they were discussing the sexual abuse with their father. The court also rightly pointed out that the Does questioning showed they were unskilled and untrained. The questions the girls asked Duran were not entirely straightforward or formulaic, but from two daughters who were trying to elicit a response from their father.

Duran fails to offer contrary evidence. Instead, he argues that Jane Does 1 and 2 acted as agents of law enforcement because they performed under law enforcement's direction and supervision. He cites *Raymond v. Superior Court* (1971) 19 Cal.App.3d 321, 326 (*Raymond*) for the proposition that a private citizen can act as an agent of law enforcement when police participation in the private citizen's action is "obvious, heavy, and undebatable." There, the Third District considered the extent of police involvement when a 12-year-old boy took a sample of drugs from his father's bedroom and provided it to law enforcement. (*Id.* at pp. 325–326.) The court held that even though the boy seized the contraband, law enforcement determined the timing, location, supplied transportation, described quantity needed, waited for the purloined drugs, and then made it a basis for a search warrant. (*Id.* at p. 326.) In those circumstances, the court held that the level of involvement by law enforcement was significant, which made the 12-year-old boy an agent of law enforcement and subject to the same constitutional demands. (*Ibid.*)

---

[5] While there is evidence Bertram wrote "notes" to the girls during the call, there is no evidence that the girls specifically followed what was on the notes. There is also no evidence that the notes from law enforcement told the girls what to say, or to threaten or offer leniency to Duran.

Other cases have also found an agency relationship when the private actor was acting under instructions and at the direction of the government and the defendant was in custody and engaged in conversation by a paid government informant acting under the direction of law enforcement. (*U.S. v. Henry* (1980) 447 U.S. 264, 270.) Our Supreme Court held that "[t]he critical inquiry is whether the state has created a situation likely to provide it with incriminating statements from an accused." (*Whitt, supra,* 36 Cal.3d at p. 742.)

We are not persuaded by the cases which found an agency relationship between a private actor and law enforcement. Here, Bertram and Inderbitzen did not instruct Jane Does 1 and 2 specifically what to say or do. As set forth above, Does 1 and 2 were told to act "normal", and law enforcement did not tell the girls to threaten Duran or offer him a promise of leniency. Unlike *Raymond, supra,* 19 Cal.App.3d at page 326, where law enforcement controlled and directed nearly every condition, here, law enforcement only provided guidance and support. There was no further " 'state action' " to support a Fourteenth Amendment constitutional violation. (See, *Connelly*, *supra*, 479 U.S. at p. 165.) On these facts it cannot be held that law enforcement had such a high level of involvement or direction to hold Jane Does 1 and 2 in an agency relationship with them.

Duran further contends Jane Does 1 and 2 coerced the statements by promising that they would not report him to the police if he explained the details of his sexual interactions with them. He cites *People v. Shelton* (1957) 151 Cal.App.2d 587, 588 to support his claim that when a police officer makes a promise that he will not arrest an individual to induce a confession, and the individual confesses, the confession is involuntary.

Duran's claim fails because the alleged promises or threats Jane Does 1 and 2 made were not at the direction of law enforcement and they were not acting as agents of law enforcement. Consequently, it is irrelevant whether Jane Does 1 and 2, both private citizens, engaged in tactics that, if they had been done by a police officer, would have

been impermissibly coercive under the due process clause. (See *Connelly, supra*, 479 U.S. at p. 166; c.f. *People v. Benson* (1990) 52 Cal.3d 754, 778–779 [an involuntary confession is obtained when there is coercion or coercive activity on the part of the state or its agents and such activity is the proximate cause of the statement in question, and not merely a cause in fact].)

Duran has failed to show the trial court erred in determining the evidence did not violate the due process clause.

### b. Admission of Bertram's Interview with Duran

Because we find the pretext call was properly admitted, we also reject Duran's claim that the trial court improperly admitted evidence traceable back to the pretext call as "fruit of the poisonous tree." (*People v. Mickey* (1991) 54 Cal.3d 612, 652 ["[b]ecause the tree was not poisonous, its fruit was not tainted"].)[6] Therefore, Duran's subsequent interview with law enforcement is also admissible.

### c. Harmless Error

We evaluate error of a coerced confession under the federal constitutional standard and determine whether admission was harmless beyond a reasonable doubt. (*People v. Cahill* (1993) 5 Cal.4th 478, 510; *Chapman v. California* (1967) 386 U.S. 18, 23.) Even if we concluded the trial court erred in admitting the pretext call and Duran's interview with law enforcement, any error was harmless.

Here, the evidence of Duran's guilt is overwhelming. Jane Does 1 and 2's crucial testimony regarding the sexual abuse they underwent at the hands of their father is strong. Jane Doe 1 testified Duran started sexually abusing her when she was about six years old

---

[6] We note Duran did not object to the admission of the interview with Bertram in the trial court as required by Evidence Code section 353, subdivision (a). Defense counsel acknowledged the interview was admissible. (*People v. Partida* (2005) 37 Cal.4th 428, 434 [" 'the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable' "].)

14.

and it lasted until she was about 20 years old. Jane Doe 2 testified the sexual abuse began when she was eight, and lasted until she was 13 years old. Jane Does 1 and 2 testified to different specific instances, provided detailed accounts of the parts of the body Duran touched, and gave the approximate number of times the sexual abuse occurred per year. They also provided testimony of Duran putting his penis in their "butts" and vaginas on different occasions. This testimony alone is sufficient to sustain Duran's convictions. (*People v. Jones* (1990) 51 Cal.3d 294, 314 [in a child molestation case, nonspecific or generic testimony from a victim—e.g., an act of intercourse "once a month for three years"—outlines a series of specific, albeit undifferentiated, incidents each of which amounts to a separate offense, and each of which may be sufficiently substantial to sustain a separate criminal conviction]; *People v. Harlan* (1990) 222 Cal.App.3d 439, 451–452 [uncorroborated testimony of a child victim may be considered substantial evidence to support a conviction of child molestation].) The jury was also properly instructed with the standard instruction regarding the testimony of a single witness, which is sufficient to prove a fact. (CALCRIM 301; *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 884–885.)

Duran's interview with law enforcement and confession obtained during the pretext call was cumulative to the testimony provided by Jane Does 1 and 2. The jury may have considered Duran's extrajudicial statements regarding the sexual abuse of his two daughters, but the jury was also able to consider the same evidence in greater detail through the testimony of Jane Does 1 and 2. (See, *People v. Cunningham* (2001) 25 Cal.4th 926, 994 [if the defendant's statements are cumulative to the other evidence properly obtained, a reviewing court may find the error harmless beyond a reasonable doubt].)

Further, Duran relied on the statements he made during the pretext call to support his defense. Defense counsel relied on Duran's denials regarding the sexual abuse during the pretext call to show he was not guilty of the charged crimes. (See *People v. Steskal*

(2021) 11 Cal.5th 332, 372–373 [any error in admitting challenged evidence was harmless in part because defendant relied on that evidence to show he was not dangerous].)

## **DISPOSITION**

The judgment is affirmed.


                                                                            FAIN, J.*

WE CONCUR:


HILL, P. J.


SNAUFFER, J.

---

        * Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.